772 A.2d 445

**Darryl M. JACOBS and Suzanne Jacobs, his Wife, and Penneco Energy Corporation, Appellants,**

v.

**CNG TRANSMISSION CORPORATION, Appellee.**

Supreme Court of Pennsylvania.

Submitted Feb. 9, 2000.

Decided May 29, 2001.

Robert W. Lambert, Indiana, for Darryl & Suzanne Jacobs and Penneco Energy Corporation.

Stanley Yorsz, Pittsburgh, for CNG Transmission.

Before FLAHERTY, C.J., ZAPPALA, CAPPY,
CASTILLE, NIGRO, NEWMAN, SAYLOR, JJ.

### OPINION

CASTILLE, Justice.

This matter comes before this Court on a Petition for Certification of Questions of Law from the United States Court of Appeals for the Third Circuit. This Court granted the petition and directed the parties to brief two questions: (1) whether a finding that the contract between the parties is ambiguous is a prerequisite to applying the doctrine of severability set forth in *Heilwood Fuel Co. v. Manor Real Estate Co.*, 405 Pa. 319, 175 A.2d 880 (1961); and (2) whether Pennsylvania jurisprudence recognizes an implied covenant to develop and produce oil or natural gas that imposes upon the lessee the obligation to attempt to produce oil and gas from the leased property.

These questions arise in the context of an equity action filed by appellants against appellee. Appellants purchased 120 acres of real estate in South Bend Township, Armstrong County on December 7, 1994. The deed contained the following encumbrance: "UNDER AND SUBJECT to a certain oil and gas lease given by Frank F. George and Sarah T. George, his wife, to New York State Natural Gas Corporation, dated February 21, 1956." [1] The 1956 lease was a modification of an earlier lease dating from 1907. The 1956 lease permitted appellee to drill and operate wells for the production of oil and gas as well as to use the land for pooling or storage of gas. Appellants were aware of the existence of and had an opportunity to review the lease before purchasing the subject property. In addition, before consummating the purchase, they were aware that appellee was operating an underground natural gas storage pool in a subsurface geological sand formation.

Appellee had not drilled any wells for oil or gas exploration or production on any property since at least 1986 and has never drilled any wells on appellants' property. The parties agree that sand formations underlying appellants' property,

---

1. New York State Natural Gas Corporation was appellee's predecessor.

and underlying the presently used storage pool, likely contain commercially productive deposits of natural gas. On February 8, 1995, after appellants took possession of the property, they notified appellee of the purchase and demanded that appellee either surrender the gas-bearing sands not being used for storage or begin the development and production of the sand formations. Appellee refused to surrender the gas-bearing sands or develop them. Appellants, believing that the production rights in the lease with appellee had "ceased," entered into an oil and gas lease with Penneco on March 21, 1995.[2]

On January 11, 1996, appellants purported to cancel the oil and gas lease with appellee by letter and then initiated suit against appellee in the Court of Common Pleas of Armstrong County on January 19, 1996. Appellee removed the action to the United States District Court for the Western District of Pennsylvania based upon diversity.[3] In their equity action, appellants sought an accounting of natural gas extracted, withdrawn or produced on the property, a finding that the oil and gas lease has terminated, and to quiet title to the oil and gas interests underlying the property.

The parties conducted discovery and appellee then filed a motion for partial summary judgment. Appellee argued in part that appellants' claim that the lease had been terminated failed because it was premised upon a theory that Pennsylvania recognizes an implied covenant to develop and produce natural gas. Appellee argued that it had no obligation to drill for oil and gas as Pennsylvania does not recognize such an implied covenant. Appellants countered that the oil and gas lease is severable i.e., that the lease grants two distinct rights, the right to drill and operate gas wells for the production of oil and gas and the right to store natural gas. Appellants acknowledged that the "storage" portion of the agreement was

2. Shortly thereafter, appellee offered to permit appellants to drill and produce oil and gas on the property under a "farmout" agreement. Appellants declined the offer believing that such an agreement was unnecessary. During the same period, the parties were engaged in a dispute regarding the storage payments due appellants under the lease.

3. 28 U.S.C. § 1332.

still in effect, but claimed that the severable oil/gas production portion of the agreement terminated due to appellee's prolonged failure to even attempt to produce gas from the property.

The District Court granted appellee's motion for partial summary judgment, and appellants appealed to the United States Court of Appeals for the Third Circuit. The Third Circuit petitioned this Court for Certification of Questions of Law, which this Court granted, framing the questions to be answered as previously set forth.

The lease at issue commenced on June 16, 1956 and had a primary term of ten years that could then be conditionally extended for an indefinite term.[4] The first paragraph of the lease at issue, entitled "Leasing Clause," sets forth the parameters of the lease:

> That the Lessor, for and in consideration of the sum of One ($1.00) Dollar in hand well and truly paid by the Lessee, the receipt whereof is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of the Lessee to be paid, kept and performed, has leased and let and by these presents does lease and let unto the Lessee for the purpose of drilling and operating for and producing oil and gas, and for the further purpose and with the exclusive right in the Lessee, as it may see fit to store any

4. The lease term is contained in paragraph three of the lease and reads as follows:

> It is agreed that this lease shall remain in force for the term of ten (10) years from June 16, 1956 and as long thereafter as the above described land, or any portion thereof, or any other land pooled or unitized therewith as provided in paragraph 4 hereof, is operated by the Lessee in the search for or production of oil or gas or as long as gas is being stored, held in storage, or withdrawn from the premises by Lessee. It is agreed that the cessation of production from wells on the leased premises or upon other land unitized therewith, after the expiration of the original term, shall not terminate this lease whether the pooling units have been dissolved or not, if the land is used for the storage of gas prior to the plugging and abandonment of wells from which oil or gas has been produced. It is understood that a well need not be drilled on the premises to permit the storage of gas, and it is agreed that the Lessee shall be the sole judge as to whether gas is being stored within the leased premises and that its determination shall be final and conclusive.

kind of gas therein by pumping or otherwise introducing the same into any sand or sands, substrata or horizon in and under said land, and the right to remove the same by pumping or otherwise through any well or wells on said land or other lands with the right to open, repair, maintain and use a roadway or roadways to wells or well locations on this or other lands and the right to construct, lay, maintain, operate, change and remove pipe lines, telephone and telegraph lines and all other appliances and structures on, over and through said lands, and with all other rights and privileges, including free oil, gas, gasoline and water from the land, necessary or convenient for the operation of this land alone or conjointly with other lands for the transportation of oil and gas produced from said land or other lands or for introducing, storing or withdrawing of gas from this land or other lands. . . .

The clause then goes on to identify the property in question, and to apportion ⅞ of all "working interest" of oil and gas produced to Lessee, and to address other points not relevant to the resolution of this question.

Three different methods of compensation are outlined in paragraph 5 of the lease (entitled "Payment to Lessor: Royalties," "Delay Rental" and "Payment for Storage Privileges.") Under the royalty provision, and specifically with respect to gas, the contemplated payment depends upon whether the gas was retrieved from a designated "shallow" or "deep" well. As to "shallow" gas, the lessee agrees to pay $50 quarterly as a royalty for each well beginning thirty days after a well is drilled and ending whenever the lessee ceases to use the well, gives written notice of its intention to abandon the well or in fact plugs and abandons the well, or ceases to save and market the gas from the property. An additional royalty of one-eighth of the value of the gas is payable for gas saved or marketed from the deeper areas. Under the delay rental provision, the lessee is obligated to pay rental fees at the rate of $30 quarterly until a royalty-yielding well is drilled on the leased premises or until lessee uses the leased premises for storage and the fee for storage becomes payable. The delay

rental provision further states: "It is agreed that Lessee may drill or not drill on the leased premises, as it may elect, and that the consideration and rentals paid and to be paid constitute adequate compensation for such privilege." Finally, lessee agrees to pay the sum of $120 annually for storage privileges. The storage payment is "in lieu of all delay rental or royalty due for the right to produce or for the production of oil or gas from the sands, strata, or horizons where gas may be stored."

## I. The Heilwood "Doctrine of Severability"

Appellants argue to this Court that the provisions of this particular lease dealing with oil and gas production are severable from the provisions dealing with gas storage because, although the intent of the parties as to severability is not stated in the contract, under rules of contract construction, the fact that the consideration to be paid for oil and gas production is separate and distinct from that to be paid for storage indicates that the provisions are severable. Appellee counters by arguing that, under Pennsylvania law, before a court may reach the issue of whether a contract is severable, the court must first find that the parties' intent is ambiguous. The Third Circuit frames this precise question by asking this Court to determine if a finding of ambiguity is a prerequisite to the application of the doctrine of severability under our decision in Heilwood Fuel Co. v. Manor Real Estate Co., 405 Pa. 319, 175 A.2d 880 (1961).

Heilwood was a specific performance action involving the construction and interpretation of a January 31, 1956, letter of intent that defendant Manor Real Estate Company wrote to Pine Township Coal Company, Inc. The letter of intent, if accepted by Pine Township Coal, was to become an interim understanding and agreement between Manor Real Estate and Pine Township Coal. The letter was divided into two parts, one entitled "Exchange" and the other entitled "Lease." The "Exchange" section provided that Manor Real Estate would convey to Pine Township Coal and Pine Township Coal would convey to Manor Real Estate ownership of certain real

estate while reserving the respective gas and oil rights in the properties and that, if Manor Real Estate did not so convey its property to Pine Township Coal, the property would be included in the "Lease" portion of the agreement. The "Lease" section then stated that Manor Real Estate agreed to lease to Pine Township Coal certain coal seams under an additional 1650 acre tract of land not included in the "Exchange" provision, set forth the terms of the contemplated lease, and provided that any coal mined and shipped on the property should be routed over Pennsylvania Railroad lines.

On February 5, 1956, Pine Township Coal accepted the proposal outlined in the letter of intent and informed Manor Real Estate that Heilwood Fuel Company, an allied company of Pine Township Coal, owned the properties Pine Township Coal was to convey to Manor Real Estate, and that Pine Township Coal was in a position to guarantee performance of that portion of the contract. Soon thereafter, Manor Real Estate and Heilwood took physical possession of each other's property, and each removed timber from the other's property. In addition, in February of 1956, Manor Real Estate leased to a coal company part of a seam of coal under Heilwood's property.

The actual exchange of deeds, however, was delayed because Pine Township Coal declared bankruptcy. Three years later, in February of 1959, Manor Real Estate and Heilwood learned that the subject properties could be exchanged despite the bankruptcy, and in November of that year, Manor Real Estate forwarded to Heilwood proposed deeds for approval. Heilwood returned the proposed deeds with some modifications. The deeds were apparently never executed and the properties never conveyed because further negotiations in that regard broke down.

Ultimately, Heilwood filed an equity action in May of 1960 seeking specific performance of the exchange provision of the contract. Manor Real Estate filed preliminary objections, which the trial court granted, finding that the exchange and leasing provisions of the agreement were interdependent and therefore not severable. Accordingly, in the trial court's view,

Heilwood was not entitled to specific performance of one part of the agreement—the exchange provisions—while completely overlooking the lease provisions. Thus was joined the question of severability.

In considering the matter on appeal, this Court began by setting forth the general rule regarding the severability/entirety of contracts:

It is often most difficult to determine whether a contract is entire or severable. The primary inquiry in resolving this question is whether the language employed in the contract clearly indicates the intention of the parties that the contract be considered entire or severable (*Easton v. Jones,* 193 Pa. 147, 44 A. 264 [(1899)]); only in the absence of a clear indication of the parties' intention from the language of the contract may resort be had to rules of construction (*Producers Coke v. Hillman,* 243 Pa. 313, 90 A. 144 [(1914)]).

*Heilwood,* 405 Pa. at 327, 175 A.2d at 884. The Court then looked to the language of the agreement between Manor Real Estate and Pine Township Coal and found, in contrast to the trial court, that it did not reveal a clear intent that the contract was to be entire rather than severable. The Court found:

The agreement makes a sharp division between the "Exchange" provisions and the "Lease" provisions; the consideration for the property exchange lies in the mutuality of the trading, while the consideration for the lease is the payment of the state royalty; while Manor clearly seeks the early development of the coal lands to be leased or traded it is to be noted that, as to the lands to be traded, nothing is stated as to the requirement of mining the coal under said lands, while, as to the lands to be leased, lessee is under an obligation to strip and mine 12,000 tons per month; while concededly the principal purpose of the agreement was to enhance coal traffic on the Pennsylvania Railroad it is only the lease which provides for the shipment of coal over Pennsylvania Railroad lines. Unlike the court below we find nothing in the language of this agreement which clearly reveals the intention of the parties that the agreement was

entire, not severable; in fact, the language of the agreement is ambiguous in this respect.

*Id.* at 327–28, 175 A.2d at 884.

Having found that the agreement was ambiguous as to the parties' intent regarding entirety/severability, the *Heilwood* Court was "obliged to seek other aids in construing the parties' intent." *Id.* at 328, 175 A.2d at 884. Specifically, the Court looked to the conduct of the parties—a factor outside the language of the contract—and the character of the consideration—a factor within the four corners of the agreement. The Court ultimately determined that the two provisions in the agreement were severable because: Manor Real Estate and Heilwood took physical control of each other's properties under the exchange provision and exercised powers of ownership such as removing timber from the properties; these actions under the exchange provision were taken without *any* corresponding action pursuant to the lease provision; and the consideration for the exchange provision was distinct from that for the lease provision. *Id.* at 328–29, 175 A.2d at 884–85. With respect to the last point, the Court referred to a "rule of construction" recognizing that "the character of the consideration may determine the severability of the contract." "[I]f the consideration is single, the contract is entire ... whatever the number or variety of items embraced ... but, if the consideration is apportioned, either expressly or by necessary implication ... the contract will generally be held to be severable...." *Id.* (citations omitted).

Appellee argues, based upon the *Heilwood* holding, that there is a hard and fast rule in Pennsylvania that a court must first find that a contract is ambiguous as to entirety/severability before the court may apply rules of contract construction to ascertain the parties' intent. As this Court understands it, the law is not so rigid.

In point of fact, although state courts (including this Court) and federal courts citing *Heilwood* uniformly have assumed, with no discussion of the issue, that ambiguity is a prerequisite to the application of any rules of contract "construction,"

the courts in practice have often utilized those same rules of interpretation to determine if the intent of the parties is clear from the four corners of the agreement. For example, in *Heilwood* itself, the Court noted the distinct nature of the "Exchange" and "Lease" consideration before it concluded that the contract was *ambiguous* as to entirety/severability. At that point, the distinct nature of the consideration—a fact apparent on the face of the contract was relied upon by the Court in finding, this time as a matter of "construction," that the provisions were severable.

Three years after the *Heilwood* decision, this Court cited *Heilwood* for the proposition that a court is bound by the clear language of a contract as to severability. *Shields v. Hoffman,* 416 Pa. 48, 204 A.2d 436 (1964). In *Shields,* partners in a painting business entered into a partnership liquidation agreement containing provisions regarding the sale of assets by one partner to the other as well as a restrictive covenant, which bound the selling partner in exchange for periodic monetary payments. The partner bound by the covenant breached it by engaging in the prohibited business during the relevant time period, and the other partner filed suit to enforce the covenant. This Court found that there was a total failure of consideration as to the covenant when the selling partner breached the restrictive covenant:

> The failure of consideration was total because by the very language of the liquidation agreement, its provisions were severable. The provision of the purchase of the assets was separate and distinct from the obligation to refrain from engaging in business. The clear language of the contract binds the court in this regard. *Heilwood Fuel Co. v. Manor Real Estate Co.,* 405 Pa. 319, 175 A.2d 880 (1961).

*Shields,* 416 Pa. at 52–53, 204 A.2d at 438.

Thus, the *Shields* Court looked not only to the express statement in the contract that its provisions were severable, but also to the separate and distinct aspects of the agreement to determine that the intent of the parties as to severability was clear. The Court did so even though there was no ambiguity. Moreover, the Court noted that it would have

found that the contract was severable even if the contract had not specified that the provisions were severable: "even if the contract did not so specify, we would conclude that the provisions of the contract are severable because the parties apportioned the consideration both as to subject matter and payment." *Id.* at 53, 204 A.2d at 438 (citing *Keenan v. Larkin,* 194 Pa.Super. 436, 168 A.2d 640 (1961) (allocatur denied)). This analysis has been repeated by other courts and supported by citations to *Heilwood. See, e.g., Continental Supermarket Food Service, Inc. v. Soboski,* 210 Pa.Super. 304, 232 A.2d 216 (1967) (parties' intent that contract was not severable determined by looking to singular nature of consideration to be paid); *Lampe v. Xouth, Inc.,* 1991 WL 29072 (E.D.Pa. Feb.27, 1991) (contract held to be severable where it was divided into two sections, "Consulting" and "Employment," and consideration to be paid under two sections was separate).

These decisions demonstrate that there is no bright line rule requiring that a court first find that the intent of the parties is unclear as to entirety/severability before it may look to factors such as the conduct of the parties and the character of the consideration to determine whether an agreement is entire or severable. The central task is to ascertain the intent of the parties. That intent may be apparent from the explicit language of the contract, as it was in *Shields,* or it may be obvious from a "construction" of the agreement, including the nature of the consideration, as was the case in *Heilwood,* and as reflected in the dicta in *Shields.* In short, principles of construction may reveal the intent of the parties no less than the actual language addressing entirety/severability. Thus, in specific response to the first certified question, this Court holds that, absent express language that a contract is entire, a court may look to the contract as a whole, including the character of the consideration, to determine the intent of the parties as to severability and may also consider the circumstances surrounding the execution of the contract, the conduct of the parties, and any other factor pertinent to ascertaining the parties' intent. The court need not make a specific predicate finding of ambiguity before undertaking the inqui-

ry—indeed, if the contract were crystal clear as to the parties' intent, severability likely would not be a contested issue.

## II. *The Implied Covenant to Develop and Produce Oil or Natural Gas*

The second question is whether Pennsylvania jurisprudence recognizes an implied covenant to develop and produce oil or natural gas that would impose upon a lessee the obligation to produce oil and gas from property leased for that purpose. This Court has touched on this issue intermittently for more than one hundred years. In *Stoddard v. Emery*, 128 Pa. 436, 18 A. 339 (1889), the Court rejected the contention that an implied covenant existed obligating the lessee to drill oil wells every four months where the contract contained express terms regarding the number of wells to be drilled. The *Stoddard* Court recognized, however, that such an implication might arise if the parties had not specifically addressed the issue:

> The proposition that there was an implied covenant to bore wells every four months, or as often as it was customary to put down additional wells in the absence of any express contract, is altogether untenable. The parties provided by the express terms of their contract how many wells should be put down, and that provision of the contract determines the question. When the number is expressed, there is no room for any implication that there should be some other number. Had there been nothing said in the contract on the subject, there would of course have arisen an implication that the property should be developed reasonably, and evidence of a custom of reasonable development by boring a given number of wells in a certain space of time would have been competent, and perhaps controlling. But that doctrine has no application in a case when the parties have expressly agreed in the contract how many wells should be bored.

Id. at 441–42, 18 A. at 339. Thus, the *Stoddard* Court recognized the existence of an implied covenant to develop, but rejected the application of the doctrine because the contract there clearly set forth the parties' expectations regarding development of the property.

Three years later, in *McKnight v. Manufacturers' Natural Gas Co.*, 146 Pa. 185, 23 A. 164 (1892), the plaintiff asserted that the defendant was under an implied covenant to drill oil wells upon the plaintiff's land in order to protect the oil and gas underlying the plaintiff's property from operations by other parties on adjoining properties. The trial court ruled in favor of the plaintiff. After analyzing the rationale behind implied covenants in farming, mining, and oil and gas leases, the *McKnight* Court declined to rule on the issue of whether such a covenant was breached or whether the defendant abandoned the property by failing to install wells, but instead remanded to the trial court for a new trial. Nevertheless, in dicta, the Court stated: "The defendant cannot hold the premises and refuse to operate them." *Id.* at 204, 23 A. at 166. Thus, the Court at least suggested that an implied covenant does exist.

In *Aye v. Philadelphia*, 193 Pa. 451, 44 A. 555 (1899), the Court quoted *McKnight*'s rationale while agreeing with the *Stoddard* Court that the express intent and agreement of the parties may overcome any "implied covenant:"

"Where a right to mine iron ore or other minerals is granted in consideration of the reservation of a certain proportion of the product to the grantor, the law implies a covenant on the part of the grantee to work the mine in a proper manner and with reasonable diligence, so that the grantor may receive the compensation or income which both parties must have had in contemplation when the agreement was entered into." [*Koch & Balliet's Appeal*, 93 Pa. 434, 442 (1880).] So, in *Ray v. Gas Co.*, 138[Pa.] 576, 589, 20[A.] 1065 [ (1891) ], it was said by our late Brother Clarke: "While the obligation on the part of the lessee to operate is not expressed in so many words, it arises by necessary implication. . . . If a farm is leased for farming purposes, the lessee, to deliver to the lessor a share of the crops, in the nature of rent, it would be absurd to say, because there was no express engagement to farm, that the lessee was under no obligation to cultivate the land. An engagement to farm in a proper manner, and to a reasonable extent, is necessari-

ly implied." That was the case of an oil and gas lease, and it has been said that the doctrine is peculiarly applicable to such leases, owing to the nature of the product. *McKnight v. Gas Co.*, 146[Pa.] 185, 23[A.] 164 [ (1892) ]; *Oil Co. v. Fretts,* 152[Pa.] 152[Pa.] 451, 25[A.] 732 [ (1893) ].

The rule in regard to contracts is that, where the parties have expressly agreed on what shall be done, there is no room for the implication of anything not so stipulated for, and this rule is equally applicable to oil and gas leases as to any other contracts. There is nothing peculiar about them in this respect.... The authorities are uniform that, [where the parties have not expressly agreed on what shall be done], there is an implied obligation on the lessee to proceed with the exploration and development of the land with reasonable diligence, according to the usual course of the business, and a failure to do so amounts to an abandonment which will sustain a re-entry by the lessor.

*Aye,* 193 Pa. at 455–56, 44 A. at 555–56.

These decisions, as well as others dating from the early 1900s, all derive from a recognition that, in many cases, the lessor's only source of consideration for the lease is royalty payments on minerals, oil or gas extracted from the property. If the lessee fails to conduct mining operations or drill for oil or gas, the lessor receives no consideration. The basis for the implied covenant, therefore, is a recognition that the lessor has entered into a bargain expecting to be compensated for the lease of the land, and principles of fairness dictate that the lessee be obligated to make diligent efforts to ensure that the lessor receives the benefit of his bargain. *See, e.g., Appeal of Baird,* 334 Pa. 410, 6 A.2d 306 (1939); *Burgan v. South Penn Oil Co.,* 243 Pa. 128, 89 A. 823 (1914).

More recently, this Court has discussed the effect of payments in lieu of royalties upon an implied covenant of development in a coal lease case. *See Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385 (1986). There, the defendant entered into a coal lease with the plaintiffs that provided for "minimum advance royalties" payable to the plaintiffs for at least three years if the defendant chose not to actively mine

the plaintiffs' property. The defendant never conducted mining activities on the plaintiffs' land and instead paid the advance royalties. The issue was whether the lease expired at the end of the initial three-year term or whether it continued thereafter so long as the defendant continued to make the advance royalty payment to the plaintiffs. The plaintiffs refused to accept payment of the advance royalties after the expiration of the three-year term of the lease. The trial court found that the plaintiffs had granted a lease to the defendant that continued in effect as long as the defendant continued to pay advance royalties. The Superior Court reversed, finding that the lease expired because such leases contain an implied duty to mine diligently which the defendant had breached.

This Court affirmed the Superior Court's holding that the lease had expired but held that the Superior Court erred in finding an implied covenant to mine where the lease provided for minimum advance royalties:

> In letting land for the extraction of minerals, an obligation to pay minimum advance royalties does not create an implied duty to mine under Pennsylvania law. We have never implied such a duty and decline to do so now.
>
> In coal mining leases, where the consideration for the privilege of removing the mineral is a royalty on the amount extracted, it is common for the parties to stipulate that a minimum advance royalty will be paid to the landowner if no mining is done. ... In *Hummel v. McFadden,* 395 Pa. 543, 150 A.2d 856 (1956), this Court implied a duty to mine in a lease agreement which did not provide for minimum royalties in the absence of mining. There, the implied covenant imposed upon the mining company a duty to commence operations in order to provide the landowner some return on his agreement. Our holding in *Hummel* leaves the contracting parties free to bargain for a provision addressing the amount and type of consideration to be paid in lieu of forfeiture should the mining company fail to commence mining operations. Pennsylvania courts have reasoned that minimum advance royalties are in the nature of liquidated damages for the lessee's failure to mine. ... Such reasoning

recognizes minimum advance royalties as the consideration flowing from the coal company to the landowner in lieu of the tonnage royalties which would be paid if mining operations were undertaken. Implying a duty to mine in the face of a minimum advance royalty clause ignores the terms agreed to by the contracting parties. (citations omitted)

\* \* \*

In *Hummel v. McFadden, supra,* the consideration flowing to the lessor was the expected receipt of tonnage royalties. Under that lease, the absence of a covenant to mine would have left the landowner without any consideration for his grant of the right to mine. In the present case, the parties have expressly agreed that minimum advance royalty payments of $420.00 per year shall be paid to the lessor if the lessee fails to work the mine. Therefore, during the lease term, whatever that term may be, there is no failure of consideration in the absence of mining and it is not necessary to imply a covenant to mine. The contracting parties themselves have dealt expressly with the possibility of a failure to mine by providing for minimum advance royalties. *Hutchison,* 513 Pa. at 197–99, 519 A.2d at 388–89 (citations and footnote omitted).

The reasoning of the *Hutchison* Court is sound and consistent with our jurisprudence preceding it. An implied covenant to develop the underground resources appropriately exists where the only compensation to the landowner contemplated in the lease is royalty payments resulting from the extraction of that underground resource. Where, however, the parties have expressly agreed that the landowner shall be compensated if the lessee does not actively extract the resource, then the lessee has no implied obligation to engage in extraction activities.[5] Thus, so long as the lessee continues to pay the landowner for the opportunity to develop and produce oil or gas, the lessee need not actually drill wells. At the point

5. What constitutes adequate compensation for this purpose obviously must be determined by taking into consideration the facts and circumstances of each individual case.

where that compensation ceases due to the expiration of the term of the lease, or pursuant the terms of the lease itself, the lessee then has an affirmative obligation either to develop and produce the oil or gas or terminate the landowner's contractual obligations. As this Court stated in *McKnight v. Manufacturers' Natural Gas Co.*, 146 Pa. 185, 204, 23 A. 164, 166 (1892): "The defendant cannot hold the premises and refuse to operate them."

This Court, of course, offers no opinion as to whether the agreement of the parties in this case forecloses implication of a covenant to reasonably develop the leasehold, as that is one of the ultimate questions facing the Third Circuit. We merely respond to the question under review by noting in the affirmative that Pennsylvania law recognizes an implied covenant but also recognizes that the specific agreement of the parties may preclude the application of the doctrine.