**In re MK LOMBARD GROUP I, LTD., Debtor.**

**No. 02–36936 SR.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 15, 2005.

---

George M. Conway, Philadelphia, PA, United States Trustee.

Mary Kay Brown, Jami B. Nimeroff, Buchanan Ingersoll, Philadelphia, PA, for Philip Lombard Street, L.P.

Allison S. Lapat, Stein & Silverman, P.C., Philadelphia, PA, for Leon W. Silverman and Gaskill Street, LLC.

Kenneth E. Aaron, Weir & Partners LLP, Salene R. Mazur, Campbell & Levine, LLC, Pittsburgh, PA, Jason W. Staib, Blank Rome, Wilmington, DE, Allen B. Dubroff, Elkins Park, PA.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

## I. *Introduction*

On May 13, 2004, the Court issued an opinion and order in the above-captioned case sustaining the Objection of Philip Lombard Street, L.P. ("PLS")[1] to Claim

---

1. Under the terms of the Amended Chapter 11 Plan of Reorganization of Debtor, MK Lom-

Number 12 of Leon W. Silverman, Esquire, on Behalf of Himself and on Behalf of Gaskill Street, LLC, ("Silverman") and to Duplicative Claim Number 32 of Abraham Woidislawsky. On March 31, 2005, the United States District Court for the Eastern District of Pennsylvania vacated that order in part and remanded for further proceedings. The Court held a hearing on this matter on September 21, 2005. For the reasons stated below, the Court sustains in part, and overrules in part, PLS's Objection. As a result, the Court allows the Silverman claim in the amount of $7,788.00.

## II. *Background*

As the Court fully set forth the factual background of this contested matter in its May 13, 2004 opinion, *see* 5/13/04 opinion, the Court will not duplicate that recitation here. On appeal, the District Court found that the Debtor materially breached Section 2(a)(ii) of the parties' September 28, 2002 agreement ("September Agreement" or "Agreement") by failing to obtain the consent of MKLG Holding Partnership, LP ("MKLG") for Silverman to assume the MKLG mortgage prior to the scheduled closing date, and that the Debtor's breach excused Silverman's obligation to tender performance under the Agreement.[2] Specifically, the District Court found that the Debtor's failure to obtain MKLG's consent created an impossibility of performance that presented an insurmountable barrier to Silverman's ability to close on or before October 30, 2002. The District Court further found that Silverman did not waive

the Debtor's default by continuing to negotiate with the Debtor for a brief period after knowledge of the breach.

Consequently, the District Court has instructed this Court on remand to consider the following issues: (1) whether Silverman's failure to comply with the notice provisions of Section 12.1 was excused due to the timing of the Debtor's breach of Section 2(a)(ii); (2) the effect, if any, of the termination letter that the Debtor sent to Silverman following the closing date; and (3) to the extent not previously addressed, whether the Debtor breached the representations and warranties of Section 10.2(h), the effect of such breach, whether Silverman was required to provide notice of such breach and, if so, the effect of the timing of such breach on Silverman's failure to provide notice. The Court will address each of these issues in turn.

## III. *Discussion*

### A. *Section 12.1 Notice*

■ The Court must first consider whether Silverman's failure to comply with the notice provisions of Section 12.1 was excused by virtue of the timing of the Debtor's breach of Section 2(a)(ii). Section 12.1 of the September Agreement provides for the return of monies advanced under the Agreement in the event of a Debtor default. That provision requires, however, that Silverman provide written notice to the Debtor of any defaults and a ten (10) day opportunity to cure the defaults. *See* Agreement, at 10–11, § 12.1

---

bard I, Ltd. (the "Debtor"), dated August 28, 2003, Debtor conveyed real property located at Third and Lombard Streets, Philadelphia, Pennsylvania to PLS. The Plan also gave PLS, as the Plan proponent, the right to file objections to creditor claims following confirmation.

**2.** Section 2 of the Agreement set forth certain obligations, one of which required Silverman to pay off or assume the mortgage obligations on the property held by MKLG, which mortgage at Section 2(a)(ii) provided that it "may be assumed at Closing and not paid off, with the agreement of MKLG, *which consent the [Debtor] shall obtain.*" *See* Agreement, at 2, § 2(a)(ii) (emphasis added).

("[n]o default by Seller under this Agreement shall result in the cancellation or limitation of any right Seller has under this Agreement, unless Purchaser provides written notice of such default and Seller shall have failed to cure such default within ten (10) days after receipt of such written notice.").

In light of the District Court's finding that the Debtor materially breached Section 2(a)(ii), thereby excusing Silverman's obligation to close, the Court finds that Silverman's obligation to provide notice of the Debtor's breach under Section 12.1 was also excused. The Court so concludes for two reasons. First, the Debtor had neither the ability nor the intention to cure prior to closing because it could not obtain MKLG's consent. Second, the Debtor's default occurred at the time of closing, which prevented Silverman from being able to obtain the necessary financing by closing. In view of these circumstances, the Court finds that Silverman was excused in this instance from his obligation to provide written notice of default and an opportunity to cure.[3]

■ Consequently, Silverman is entitled to the remedies for default set forth in Section 12.1 of the Agreement. In that regard, Section 12.1 provides that, in the event of a seller default, "Purchaser's sole and exclusive remedy shall be to receive the return of any sums of money advanced by Purchaser pursuant to this Agreement prior to Closing ...." *See* Agreement, at 10, § 12.1. As this Court previously found, and the District Court affirmed, the sums of money advanced to which Silverman is entitled in the event of default include only the $32,788 September advance-not the June advances.[4]

The $32,788 amount, however, must be reduced by $25,000 which already has been paid by the Debtor to Silverman under the Plan.[5] Silverman disagrees. Silverman argues that the $25,000 payment he received from the Debtor was made to relieve Mr. Goldner of a separate $25,000 payment guaranty having to do with one of the two June advances, and that the *total* amount of his claim was reduced by $25,000, "leaving [the parties] only fighting over the 32,000 and the 100,000 [payments]." *See* 9/21/05 *N.T.* at 8. In Silverman's view, if the $25,000 payment already made to him was made to indemnify Goldner for his promise to repay the $25,000 June advance, the Debtor should not be allowed to

---

3. On October 31, 2002, the Debtor's counsel notified Silverman by letter that he was in default, and the Agreement accordingly terminated. The Court finds further that the Debtor's letter was ineffective in light of the District Court's finding that the Debtor's breach made it impossible for Silverman to close by October 30. Moreover, Silverman's receipt of such letter suggested that the Debtor had no intention of curing its own default or proceeding with the Agreement. As such, the Court finds that the default letter has no impact on Silverman's right to seek remedies under the Agreement on account of the Debtor's breach.

4. By way of brief recapitulation, the September Agreement supplanted an earlier failed agreement between the parties dated June 10, 2002 (the "June Agreement"). Under the June Agreement, Silverman and his predecessor-in-interest Woidislawsky made two advances to the Debtor: an initial advance of $100,000 on June 1, 2002, and a second advance of $25,000 on July 19, 2002 (individually, the "June advance" or collectively, the "June advances"). Under the September Agreement, Silverman made an additional advance of $32,788 (the "September advance").

5. Under the Plan, the Debtor agreed to pay Silverman the sum of $25,000 in light of an indemnification provision in the Plan, through which the Debtor agreed to indemnify Goldner for a $25,000 personal guaranty that Goldner issued to Silverman for paying $25,000 of the June advances. Under the Plan, the $25,000 was designated as an "undisputed" portion of the Claims.

take a credit for that amount against the $32,788 advance it owes him for its contract breach. PLS, on the other hand, argues that the $25,000 paid by the Debtor cannot be attributed to repayment of the $25,000 June advance, because the Court has already determined that neither of the June advances is recoverable from the Debtor. Instead, PLS maintains that the $25,000 payment should be credited against the amount of any allowed claim in favor of Silverman.

The Court agrees with PLS for several reasons. First, the Court has indeed already held that Silverman is not entitled to recover either the $100,000 or $25,000 June advance, a finding that was affirmed on appeal. Second, the Court found that the $25,000 payment made to Silverman under the plan was "undesignated," and therefore cannot be tied to any particular purpose. Instead, the payment simply reduces the gross amount of any allowed claim held by Silverman in this case. On this score, the Court has specifically held that nothing in the record could be read to characterize the $25,000 payment called for under the plan as an admission by the Debtor that either the $25,000 or the $100,000 advance made in June was owed by it. The Court, accordingly, will not allocate the $25,000 payment to the $25,000 disallowed June advance, as Silverman demands, but will reduce by $25,000 the amount of Silverman's allowed claim herein. As the allowed claim equals $32,788, Silverman is entitled to $7,788 ($32,788 less $25,000 paid).

**6.** This Court previously held that, even assuming *arguendo* that the Debtor breached Section 10.2(h), Silverman was not entitled to recover damages because he failed to properly send written notice of such default as required by Section 12.1. *See* 5/13/04 opinion, at 14. In accordance with the District

## B. *Section 10.2(h) Representations and Warranties*

Next, to the extent it has not already done so, the Court must consider whether the Debtor breached the representations and warranties contained in Section 10.2(h), the effect of this type of breach, and whether Silverman was required to provide notice of this breach based on the language of the Agreement and the timing of the breach.

Silverman seizes on the District's Court's instruction to reconsider a Section 10.2(h) breach as an opportunity to argue that such a breach resuscitates his claim for the $125,000 June advances. Specifically, Silverman argues that, because the Section 10.2(h) representations and warranties induced him to enter into the Agreement, a breach of those representations and warranties invalidates the entire contract, including Section 30. From that premise, he reasons that the invalidation revives his entitlement to the $125,000 in a pre-September Agreement world. *See* 9/21/05 N.T. at 11. The Court finds Silverman's attempt to look beyond an undisputably unambiguous agreement, that explicitly provides remedies in the event of a default, wholly lacking in legal support.

■ Turning first to the merits,[6] the Court finds that the Debtor did breach Section 10.2(h) by failing to notify Silverman of three judgments against the Debtor, but that such breach was not material. Section 10.2(h) provides:

Seller has informed Purchaser that Allied, McLead Floors, Tru–Fit–Frame & Door and Strober–Haddonfield have

Court's mandate, the Court will expand upon this and address whether the Debtor breached Section 10.2(h), the effect of such a breach, and whether the timing of such breach had any effect on Silverman's failure to provide notice of the default.

filed mechanics liens against those portions of the Premises on which construction has taken place, and that one or more Contractors have instituted litigation against Seller in one or more jurisdictions. Purchaser agrees that as part of the Purchase Price and its payment obligations associated therewith as set forth in *Section 2* of this Agreement, that any liens and/or judgments associated the matters described herein are to be included on the Schedule of Permitted Exceptions attached hereto as *Exhibit C*, but which Purchaser shall have the discretion to resolve in any manner it desires, either before or after Closing, including the assumption of the defense in any current litigation. Goldner and Kline, on behalf of Seller, agree to fully cooperate with Purchaser in the defense of any litigation with the Contractors without charge to Purchaser, provided such cooperation does not include the payment by Seller or by Goldner or Kline of counsel fees, judgments, or any settlements.

*See* Agreement, at 9, § 10.2(h). Silverman contends that the Debtor breached Section 10.2(h) by failing to disclose two judgments by Brickcrafters and one judgment by Creative Finishes on Exhibit C to the Agreement. The evidence establishes that the Debtor failed to disclose these three judgments on Exhibit C as was required by Section 10.2(h). The non-disclosures constituted a breach. The question then becomes whether such breach was material.

■ In determining materiality, courts consider the following factors:

(1) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(2) the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;

(3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(4) the likelihood that the party failing to perform or offer to perform will cure his failure, taking account of all the circumstances including reasonable assurances;

(5) the extent to which the behavior of the party failing to perform or offer to perform comports with the standards of good faith and fair dealing.

Restatement (Second) of Contracts § 241 (1981). *Accord Jennings v. League of Civic Organizations of Erie County*, 180 Pa.Super. 398, 119 A.2d 608 (1956). The Court finds that the Debtor's breach of Section 10.2(h) was not material for the following reasons. Of most importance, it is clearly evident that the parties' deal did not fail apart due to the Debtor's failure to give notice of these three outstanding judgments. In other words, this breach did not deprive Silverman of the benefit he reasonably expected; i.e., to close on the property. Indeed, had the parties reached closing, Silverman could have been compensated for this breach by a reduction of the closing price, or payment in full of the judgments by the Debtor as required by Section 2(a)(ix) of the parties' Agreement.

Moreover, the evidence demonstrates that the Debtor substantially complied with the obligations of Section 10.2(h) by providing notice to Silverman on September 17, 2002 of pending litigation against it. *See* Exhibit PLS9 (faxed letter identifying numerous claims of contractors, including pending litigation by Brickcrafters and Creative Finishes). In fact, the letter indicates that, as of September 17, answers were not yet due in the Brickcrafters or Creative Finishes cases; thus, no default judgments could have been entered

at that time. Although the Court would agree that the information should have-and could have-been supplemented as the course of proceedings changed, the intent of the provision was to place Silverman on notice of outstanding liabilities against the Debtor. The Court finds that the information provided substantially complied with that intent.

Furthermore, Silverman's testimony as to when he learned of these defaults is not entirely clear, but it suggests that he had knowledge of the situation prior to or right around the closing date, thereby minimizing the harm he claims the Debtor caused. *See* 12/18/03 N.T. at 106–107 (Silverman) (testifying he learned of the judgments "definitely after October 9, 2002 and I believe it was toward the very end of October. I'm not positive about that."); 12/18/03 N.T. at 133 (Silverman) ("I had knowledge of those judgments right around October 30th.").

Finally, no evidence suggests that the Debtor acted in a willful or intentional manner to withhold notice of the default judgments. Nor does the record suggest that the Debtor entered into the Agreement knowing it could not adhere to the representations and warranties set forth in

Section 10.2(h). This is clearly the case of a default that occurred during the course of performance of the Agreement and not one that would operate to void the contract ab initio. On this score, as this Court previously held, Silverman has no viable claim for fraud in the inducement. *See* 5/13/04 opinion, at 23–27. Weighing all of the above, the Court concludes that the Debtor's breach of Section 10.2(h) was not material.[7]

■ Even if the Court found the breach to be material, however, the remedy for such breach would be the refund of the September advance-not the voiding of the entire Agreement. On this score, as the claimant, Silverman bears the ultimate burden of proof.[8] The Court finds that for several reasons Silverman has not met his burden of showing that he is entitled to recoup the $125,000 June advances.

Perhaps most compelling, the Agreement provides that Silverman waived his entitlement to the $125,000 June advances-except under defined circumstances which do not apply-when he entered into the September Agreement. The September Agreement therefore became the controlling contract between the parties, and its unambiguous [9] language confirms the dis-

7. Silverman also contends that the Debtor breached representations it made concerning the amount due under the mortgage, the releasing of lots, and the reduced letter of credit. Although Silverman would like to relitigate these issues-as counsel raised them again at the September hearing-the Court is not required to do so, nor would it be appropriate to do so, given the limited parameters of the District Court's order. Moreover, like the breach of Section 10.2(h), there has been no evidence showing that the Debtor knew it could not adhere to these other representations when it entered into the Agreement nor, as this Court previously held, does the evidence even begin to support a claim for fraud in the inducement. *See* 5/13/04 opinion, at 23–27.

8. Assuming the claimant initially alleges facts sufficient to support his claim, the burden shifts to the objector to submit evidence sufficient to negate the *prima facie* validity of the claim. *See In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir.1992). If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, however, the burden shifts back to the claimant to prove the validity of the claim by a preponderance of the evidence. *Id.* at 174.

9. This Court found the Agreement to be express and unambiguous. *See* 5/13/04 opinion, at 9. The District Court noted that neither party has argued that the bankruptcy court erred by finding the Agreement unambiguous, and Silverman never briefed the issue on ap-

solution of the parties' prior agreement: "[t]his Agreement, when executed by both Seller and Purchaser, *shall supersede and render null and void* that certain Agreement of Sale dated June 10, 2002 ... and shall constitute a *complete and general release of all claims*, if any which either party to said Prior Agreement had, has, or may have against the other party or parties to said Prior Agreement." *See* Agreement, at 17, § 30. The Agreement also explicitly states how the parties intended to treat defaults: "If Seller shall default ... then Purchaser's *sole and exclusive remedy* shall be to receive the return of any sums of money advanced by Purchaser pursuant to this Agreement prior to Closing ...." *See* Agreement, at 10, § 12.1. In light of the above language, the Court finds that Silverman's attempt to revive his claims to the $125,000, based on a default of a provision contained in an Agreement in which he clearly and unequivocally relinquished his entitlement to such monies, is unavailing.

■ In addition to the plain language of the Agreement, other well recognized principles of common law militate against Silverman's position. A finding of default does not automatically void an entire agreement but, rather, leaves the parties with the remedies provided for in the con-

tract. *See, e.g., Reed v. Pittsburgh Bd. of Public Education,* 862 A.2d 131, 136 (Pa. Commw.Ct.2004) (citing Restatement (Second) of Contracts section 33, comment b (1979)) ("Contracts should be made by the parties, not by the courts, and hence, remedies for breach of contract must have a basis in the agreement of the parties.").[10] "[I]n the law of contracts, remedies for breach are designed to protect either a party's expectation interest 'by attempting to put him in as good a position as he would have been had the contract been performed, that is, had there been no breach'; his reliance interest 'by attempting to put him back in the position in which he would have been had the contract not been made'; or his restitution interest 'by requiring the other party to disgorge the benefit he has received by returning it to the party who conferred it.' " *Ferrer v. Trustees of the University of Pennsylvania,* 573 Pa. 310, 825 A.2d 591, 609 (2003) (citing *Trosky v. Civil Serv. Comm'n,* 539 Pa. 356, 652 A.2d 813, 817 (1995)) (citing Restatement (Second) of Contracts, § 344, comment a). In the instant case, the Agreement gives the Court guidance as to the appropriate remedy for a breach: in the event of a seller default, purchaser's remedy shall be the refund of advances provided under the Agreement, i.e., the $32,788.[11] Such clear language obviates

peal, and therefore the issue is waived. *See* 3/31/05 District Court opinion, at 11, n.8.

**10.** A material breach by one party to a contract may entitle the non-breaching party to suspend performance. *See Widmer Engineering v. Dufalla,* 837 A.2d 459, 467 (Pa.Super.Ct.2003); *see also* 14 Williston on Contracts § 43:5 (4th ed.) (a party first to default under a bilateral contract cannot recover for the subsequent failure of the other party to perform). It does not, however, entitle one party to void the contract. Indeed, even in the case where one party's default made the other party's performance impossible, courts have found that the affected party is not entitled to void the contract. *See, e.g., In the*

*Matter of Farrell,* 27 B.R. 241, 246 (Bankr. E.D.N.Y.1982) (citing *Comment* Restatement (Second) of Contracts Section 7 (1979)) ("A finding of impossibility discharges the duty to perform once that duty has arisen as a result of a binding agreement. The defense does not operate to render an agreement void or voidable as do defenses which constitute defects to formation such as illegality, fraud or incapacity.").

**11.** The Court notes that Section 12.1 is the only provision in the Agreement addressing seller defaults. Nothing in the Agreement speaks specifically to remedies for breach of the representations and warranties provision. Consequently, in the event of any breach-

the need for the Court to fashion a different remedy.

██ Moreover, to the extent that Silverman argues that the Agreement is severable, his argument is not supported by the language of the Agreement. The Court understands Silverman's position to be that a breach by the Debtor of the representations and warranties contained in Section 10.2(h) renders the rest of the provisions of the contract-including Section 30--unenforceable, which would revive his claim to recovery of the $125,000 June advances.[12] It is well established that whether a contract is entire or divisible is controlled by the intention of the contracting parties. *See* 15 Williston on Contracts § 45:5 (4th ed.). In this regard, the central task in deciding whether provisions in a contract are severable is to ascertain the intent of the parties. *See Jacobs v. CNG Transmission Corp.*, 772 A.2d 445, 452 (2001); *see also Heilwood Fuel Co. v. Manor Real Estate Co.*, 405 Pa. 319, 175 A.2d 880, 884 (1961) (primary inquiry is whether the language employed in the contract clearly indicates the intention of the parties that the contract be considered entire or severable); 15 Williston on Contracts § 45:5 (4th ed.) ("the intent of the parties as revealed by the express contract terms or language is generally held to be the determinative factor in deciding whether a contract is divisible or entire."). That intent may be apparent from the explicit language of the contract or it may be obvious from a construction of the agreement, including the nature of the consideration. *Jacobs*, 772 A.2d at 452. Thus, "absent express language that a contract is entire, a court may look to the contract as a whole, including the character of the consideration, to determine the intent of the parties as to severability and may also consider the circumstances surrounding the execution of the contract, the conduct of the parties, and any other factor pertinent to ascertaining the parties' intent." *Id.*

██ Here, it is evident that the parties intended the Agreement to be entire rather than severable. Although lacking an express severability provision, a reading of the Agreement makes clear the parties' intent. For example, the recital to the Agreement reflects a single objective: that Seller, as the owner of a certain real property, desires to sell, and Purchaser desires to purchase, the property. In addition, the contract indicates that the transaction is to be completed in its entirety at closing with no apportioning of consideration or performance. Pennsylvania law suggests that a contract generally is deemed to be severable only where the parties have made an apportionment of the consideration. *See Heilwood*, 175 A.2d at 884-85 (" 'It has been stated that if the consideration is single, the contract is entire[ ] but, if the consideration is apportioned, either expressly or by necessary implication [ ] the contract will generally be held to be severable.' ").

Furthermore, there is no indication that the parties intended to enter into an agreement designing to accomplish two or more separate and distinct undertakings or intending that Section 30 stand divisible from the remainder of the contract. To the contrary, a fair reading of the contract as a whole, the details of the consideration,

including a breach of Section 10.2(h)the Court must to look to Section 12.1 for guidance.

**12.** The Court hastens to note that Silverman never raised the issue of severability before this Court or in his appeal before the District Court, and therefore the issue is not properly before the Court. Nevertheless, the Court will address the issue for the sake of comprehensiveness.

and the circumstances surrounding the execution of the Agreement, all indicate the parties intended it to be entire. Consequently, Silverman cannot recover on the theory that a breach by the Debtor of one provision (i.e., § 10.2(h)) invalidates all the remaining provisions of the contract, including Section 30.

██ Finally, even assuming arguendo that a material breach occurred, in order to be entitled to the remedies set forth in Section 12.1, Silverman was obligated to provide written notice and an opportunity to cure, neither of which he did. The breach of Section 10.2(h) occurred when the Debtor learned of the judgments entered against it but failed to disclose them. Silverman learned of the judgments-and therefore the breach-prior to or right around closing. Had Silverman provided notice, the Debtor could have cured that breach, as this breach was entirely curable and did not materially affect Silverman's ability to close. The timing of the Debtor's breach therefore did not excuse Silverman's failure to provide the requisite notice under Section 12.1. Accordingly, Silverman is not entitled to any remedies for breach of Section 10.2(h).

## IV. *Conclusion*

For all of the foregoing reasons, the Court finds that Silverman is entitled to $7,788.00 and his claim shall be allowed in that amount.

An appropriate order follows.

### ORDER

**AND NOW**, upon consideration of the issues delineated for remand in the March 31, 2005 Opinion issued by the Honorable Legrome D. Davis of the United States District Court for the Eastern District of Pennsylvania, and after a hearing held thereon on September 21, 2005, it is hereby:

**ORDERED**, that for the reasons stated in the accompanying Opinion, Philip Lombard Street, L.P.'s ("PLS") Objection ("Objection") to Claim Number 12 of Leon W. Silverman, Esquire, on Behalf of Himself and on Behalf of Gaskill Street, LLC, and to Duplicative Claim Number 32 of Abraham Woidislawsky shall be and hereby is SUSTAINED in part, OVERRULED in part; and it is further:

**ORDERED**, that Silverman's claim is allowed as a general unsecured claim without priority in the amount of $7,788.00. The Duplicative claim (Number 32) of Abraham Woidislawsky, is disallowed in its entirety.