**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 10-3779

———

MARVIN RAAB
Appellant,

v.

HOWARD LANDER; 929 SOUTH STREET ASSOCIATES, LP

———

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
D.C. Civ. No. 2:08-CV-4187
District Judge: The Honorable Eduardo C. Robreno

———

Submitted Under Third Circuit LAR 34.1(a)
April 29, 2011

———

Before: BARRY, HARDIMAN, and TASHIMA,[*] Circuit Judges.

(Opinion Filed: May 11, 2011)

———

OPINION OF THE COURT

———

———

[*]  Honorable A. Wallace Tashima, Senior Circuit Judge, United States Court of
Appeals for the Ninth Circuit, sitting by designation.

TASHIMA, <u>Circuit Judge</u>:

Marvin Raab appeals the District Court's grant of summary judgment to defendants Howard Lander and 929 South Street Associates, LP. We have jurisdiction under 28 U.S.C. § 1291, and we will affirm.

**I.      Factual and Procedural Background**

On July 11, 1996, Marvin Raab and his friend Howard Lander signed an agreement entitled "Preliminary Investment Agreement" ("Agreement") involving purchase of an interest in a property located at 929 South Street in Philadelphia ("929 South Street").[1] Raab was represented by counsel; Lander was not. Under the Agreement, Raab would provide $30,000 to Lander, who was to purchase a 50 percent interest in the property for $90,000. It was understood that the property would be leased to Whole Foods Market, Inc., by Lander and the other purchaser of the property, Max Berger.

What the Agreement provided Raab in return is under some dispute. The Agreement provides that "[f]or and in consideration of [Raab's $30,000], Raab will receive and entitled [sic] to twenty percent (20%) or one-fifth (1/5th) of" Lander's interest in the property, but that "Raab's name will not appear in any deed or other document of title" regarding the property, except as further provided in the Agreement. Paragraph 3 of the Agreement provided that "[i]n order to provide security for" Raab's

---

[1]    The Agreement lists the address of the property as 939 South Street. The parties agree that the property is actually located at 905 to 929 South Street.

2

$30,000, Lander would execute a $30,000 mortgage on another property that would be payable to Raab as mortgagee at six percent interest per annum (the "Raab Mortgage"). The Raab Mortgage would "be payable at the time of any refinancing of" Lander's share in 929 South Street or upon any sale of the same. The Agreement further provided that "notwithstanding the provisions of paragraph 3," when Lander's share of the property is refinanced, "which will occur within eighteen (18) months after Lander and Berger close on" 929 South Street, Raab's $30,000 "will be converted in to [sic] an interest in a limited partnership which will be established among Lander, Raab and two (2) other investors who are providing Lander with additional capital in order for Lander to acquire" his interest in 929 South Street. "It is understood that, in any limited partnership, the Raab Mortgage will be a twenty percent (20%) or one-fifth (1/5th) interest in" Lander's share of 929 South Street. The Agreement noted that the purpose of forming a limited partnership was to protect Raab's $30,000 "and to provide the means by which Raab will be repaid. Raab will be secured by the Raab Mortgage which will become due and payable if Lander and Berger do not refinance" the loan being used to acquire 929 South Street. If Lander was to sell either the whole of 929 South Street or his interest in the property before the formation of the limited partnership, Raab would be entitled to $30,000 plus 20 percent of Lander's profit on the sale.

No limited partnership between Raab and Lander was ever created, however. Raab testified that he repeatedly asked Lander about when his interest would be

3

documented over the years, and Lander always had excuses. In April 2001, however, Raab received a check from Lander for $45,000 with the phrase "Repayment Fresh Fields loan" in the memo line. Confused, Raab called Lander. He told Lander that he didn't know what the memo meant and that he "just want[ed] [Lander] to understand that [Raab was an] owner in this property." Lander indicated that he understood.

Raab received no further money from Lander in relation to 929 South Street. Between 1996 and 2006, Raab received no K-1Form relating to his ownership interest in 929 South Street. In 2006, he had someone go to city hall and saw that no mortgage was of record for him on Lander's other property pursuant to paragraph 3 of the Agreement. Early in 2008, after discussing his concerns with Lander, Raab, with the help of a cousin of his who is also an attorney, drafted a "Memorandum of Agreement and Intention" to memorialize their understanding in writing. Lander never signed the Memorandum of Agreement and Intention.

On August 28, 2008, Raab filed a six-count complaint, alleging that Lander failed to perform his duties under the Agreement and seeking to enforce the Agreement. The defendants moved for summary judgment. On consideration of the motion, the District Court concluded that all of Raab's claims were barred by the statute of limitations, and entered judgment in favor of the defendants.

## II. Standard of Review

"We exercise de novo review over the District Court's grant of summary

judgment." Ray v. Twp. of Warren, 626 F.3d 170, 173 (3d Cir. 2010). We view the facts in the record and draw inferences therefrom in the light most favorable to the nonmoving party. Id.

## III.    Analysis

"In Pennsylvania, a breach of contract claim has a statute of limitations of four years." Hahnemann Univ. Hosp. v. All Shore, Inc., 514 F.3d 300, 306 (3d Cir. 2008). Raab does not argue that a 4-year statute of limitations is inapplicable to the present case or contend that different statutes of limitations may apply to some of his claims; with respect to the statute of limitations, he argues only that the statute had not run at the time he initiated suit.[2] Raab makes three distinct arguments that the statute of limitations does not apply in this case.

First, Raab argues that the contract is divisible, because it required Lander to take a series of actions at different times, some of which required cooperation of individuals not party to it. We disagree. Under Pennsylvania law, a court is bound by the clear language of a contract as to severability. See Jacobs v. CNG Transmission Corp., 565 Pa. 228, 772 A.2d 445, 451 (2001). Where, as here, however, there is no "express language that a contract is entire," id. at 452, a court may look to the conduct of the parties and the

---

[2]    Raab also argues that the Agreement is ambiguous and that the ambiguity creates a material issue of fact precluding summary judgment. Because the Agreement is not ambiguous insofar as it relates to the application of the statute of limitations, however, any ambiguity in the contract does not create an issue of material fact that would preclude summary judgment.

character of the consideration to determine severability. In particular, courts have relied on the following rule of construction to determine severability: "If the consideration is single, the contract is entire . . . whatever the number or variety of items embraced . . . but, if the consideration is apportioned, either expressly or by necessary implication, the contract will generally be held to be severable . . . ." Id. at 451 (ellipses in original) (quoting Heilwood Fuel Co. v. Manor Real Estate Co., 405 Pa. 319, 175 A.2d 880, 885 (1961)); see also Producers' Coke Co. v. Hillman, 243 Pa. 313, 90 A. 144, 145 (1914) ("The distinguishing mark of a divisible contract is that it admits of apportionment of the consideration on either side so as to correspond to the unascertained consideration on the other side."). Here, Raab provided only a single, total payment for all of Lander's obligations: $30,000. Accordingly, the contract is not severable.

Second, Raab argues that the contract is a continuous one because it contemplates a partnership where both owners would share in a real estate project and because Lander would be responsible for management of the property. Raab relies on language from Thorpe v. Schoenbrun, 202 Pa.Super. 375, 195 A.2d 870 (1963), to argue that because there was no fixed time for the termination of these services, no fixed duration for the partnership, and no provisions for the payment of income generated from the property, the contract was a continuing one. Thorpe, however, provides that "the test of continuity, so as to take the case out of the operation of the statute of limitations, is to be determined by the answer to the question whether the services were performed under one continuous

6

contract, with no definite time fixed for payment . . . ." Id. at 872. Here, the contract

contained a fixed termination date: Raab would be repaid either through the creation of a

limited partnership no later than 18 months after Lander and Berger closed on 929 South

Street, or by other means assuming the property was never purchased or was sold by

Lander and Berger before that point. To the extent that Raab relies on Lander's

performing services under the contract, his time for payment was also fixed: he was to be

provided the $30,000 before the closing date for purchase of 929 South Street.[3] Cf.

Miller v. Miller, 2009 Pa. Super 197, 983 A.2d 736, 742 (2009) (finding contract to be

continuing where husband in postnuptial agreement unequivocally assumed sole

responsibility for payment of mortgage, taxes and insurance on the marital residence);

Thorpe, 195 A.2d at 873 (finding continuous contract where doctor treated patient over a

period of years "for the overall purpose of preserving the sight of the [defendant's] eyes

and preventing blindness" and that "[i]nherent in this employment was an extended

period of continuous services which were interdependent and related"). Accordingly, the

contract was not a continuing contract.

---

[3]    Thus, Raab's contention that the Agreement provided him with an immediate
equitable interest in the property is immaterial. Even assuming that his interpretation of
the contract is correct in this respect, by no later than eighteen months after Lander and
Berger closed on 929 South Street, any equitable interest in the property of Raab's was to
be converted into a legal interest in a limited partnership.
        Similarly, Raab also argues that he was entitled to waive the breach and continue
the contract. This argument depends on the contract being continuous and governing an
ongoing relationship between Raab and Lander. We need not address this argument
given our holding that the Agreement is not a continuing contract.

Finally, Raab argues that Lander is estopped from invoking the statute of limitations based either on fraudulent concealment or on the acknowledgment doctrine. Under the doctrine of fraudulent concealment, "the defendant may not invoke the statute of limitations, if through fraud or concealment, he causes the plaintiff to relax his vigilance or deviate from his right of inquiry into the facts." Fine v. Checcio, 582 Pa. 253, 870 A.2d 850, 860 (2005). The fraudulent concealment theory does not help Raab, however. Assuming arguendo that Lander's statements would be sufficient to establish fraudulent concealment on some set of facts, "a statute of limitations that is tolled by virtue of fraudulent concealment begins to run when the injured party knows or reasonably should know of his injury and its cause." Id. at 861. Thus, the party asserting fraudulent concealment must "exercis[e] reasonable diligence" to discover his injury and its cause. Id. By its terms, the Agreement provided that Lander's share in 929 South Street would be converted into a partnership within eighteen months of Lander's and Berger's closing on the property, which Raab understood was to occur "a couple [of] days" after he and Lander signed the Agreement. Raab testified that he consistently spoke to Lander about documenting his interest as early as sometime between July 1997 and July 1998 and "at least three, four times a month" through 2001, though he never specifically asked Lander about the refinancing. In addition, he knew he had received no Form K-1 for 929 South Street, which, as a member of several other partnerships that owned real estate, he knew or should have known that he would receive if he were a

8

partner in the ownership of 929 South Street. Thus, regardless of the extent that Lander misled him about Lander's willingness to resolve the issue, Raab admittedly "knew of his injury and its cause." Fine, 870 A.2d at 855. Further, in April 2001, he received a $45,000 check from Lander with the phrase "Repayment Fresh Fields loan"[4] in the memo line, which troubled him enough to call Lander and say "I just want you to understand that I'm a [sic] owner in this property." On these facts, Raab should reasonably have known of his injury and its cause by at least April 2001.

Under the acknowledgment doctrine, "a statute of limitations may be tolled or its bar removed by a promise to pay the debt." Huntingdon Fin. Corp. v. Newtown Artesian Water Co., 442 Pa.Super. 406, 659 A.2d 1052, 1054 (1995). Raab argues that because Lander said "I understand" when he told Lander that he was still an owner of the property notwithstanding the $45,000 check, Lander unequivocally acknowledged Raab's ownership under the Agreement. For the acknowledgment doctrine to operate to toll the statute of limitations, however, the acknowledgment

      must be consistent with a promise to pay on demand and not accompanied

---

[4] Before the District Court, Raab objected as unsupported in the record the defendants' assertion that Fresh Fields and Whole Foods are the same entity. On appeal, however, Raab essentially concedes that they are the same, arguing with respect to the $45,000 check that it was not specifically linked to his $30,000 because he "didn't provide Whole Foods with money, he provided it to Mr. Lander." Cf. Company History, Whole Foods Market, http://www.wholefoodsmarket.com/company/history.php#6 (last visited Mar. 28, 2011) ("At the time of the merger with Whole Foods Market in 1996, Fresh Fields had 22 stores open in four different market areas: Washington/ Baltimore, Philadelphia, New York/New Jersey/Connecticut and Chicago.").

9

by other expressions indicating a mere willingness to pay at a future time. A simple declaration of an intention to discharge an obligation is not the equivalent of a promise to pay, but is more in the nature of a desire to do so, from which there is no implication of a promise.

Id. (internal quotation marks omitted) (quoting Gurenlian v. Gurenlian, 407 Pa.Super. 102, 595 A.2d 145, 151 (1991)). Further, "[t]here must . . . be no uncertainty either in the acknowledgment or in the identification of the debt." Id. (internal quotation marks omitted) (quoting Gurenlian, 595 A.2d at 151). To the extent that Raab's testimony demonstrates an acknowledgment of an obligation on Lander's part, it does not satisfy the "strict requirement[s]" set forth above. Id. Raab does not say that Lander agreed to document the partnership at a specific point, to pay any particular amount in the future as partnership distributions, or explain what effect the check had on any kind of partnership share that Raab may have had.

Accordingly, the four-year statute of limitations had run by the time Raab filed his complaint in August of 2008.

**IV. Conclusion**

For the reasons we have discussed, we will affirm the judgment of the District Court.

10