J-S32037-15

2015 PA Super 181

| | | |
|---|---|---|
| SENECA RESOURCES CORPORATION, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| S & T BANK, TRUSTEE OF THE | : | |
| RAYMOND C. HUMPHREY TRUST, | : | |
| WILBER L. HUMPHREY INSURANCE | : | |
| TRUST B, S & T BANK, CO-TRUSTEE OF | : | |
| THE DANYA MARDER SPECIAL NEEDS | : | |
| TRUST, JAMES HUMPHREY AND RITA H. | : | |
| HUMPHREY, HUSBAND AND WIFE, | : | |
| MARY H. MARDER AND KATHLEEN | : | |
| SAMANTHA MARDER, | : | |
| | : | |
| Appellants | : | No. 2057 WDA 2014 |

Appeal from the Order entered on December 2, 2014
in the Court of Common Pleas of Jefferson County,
Civil  Division, No. 602-2009 C.D.

BEFORE:  SHOGAN, OLSON and MUSMANNO, JJ.

OPINION BY MUSMANNO, J.:                    **FILED AUGUST 31, 2015**

S & T Bank, Trustee of the Raymond C. Humphrey Trust, Wilber L. Humphrey Insurance Trust B, S & T Bank, Co-Trustee of the Danya Marder Special Needs Trust, James Humphrey and Rita H. Humphrey, husband and wife, Mary H. Marder, and Kathleen Samantha Marder (collectively "the Appellants") appeal from the Order granting the Motion for Summary Judgment filed by Seneca Resources Corporation ("Seneca").  We affirm.

On April 17, 1962, Humphrey Industries Inc. ("Humphrey"), the lessor, and Jefferson County Gas Company ("Jefferson"),[1] the lessee, entered into an oil and gas lease ("Lease").[2] The Lease allowed the lessee to produce, store, withdraw, or transmit oil and gas from the "leased premises," which constituted approximately 25,000 acres situated in Elk and Jefferson Counties. The Lease had a primary term of 40 years, with a secondary term to continue as long as oil or gas was stored, produced or withdrawn from any portion of the leased premises. At the inception of the Lease, approximately 10,000 acres of the leased premises were undeveloped (unoperated), and 15,000 acres were developed (operated). The Lease stated that the lessee would pay royalties on any oil or gas produced from the operated acreage on the leased premises.[3] The Lease outlined a "lump sum or rental payment" schedule for the unoperated acreage.

The trial court set forth the relevant underlying facts as follows:

By the time Seneca acquired its interest in the Lease, its predecessor(s) had already drilled more than 300 oil and natural gas wells, more than 100 of which were still producing, on the

[1] The Appellants are successors in interest to Humphrey. Seneca is a successor in interest to Jefferson.

[2] The Lease was entered pursuant to a January 1, 1962 Agreement ("Agreement") between Humphrey and Jefferson. At the inception of the Lease, Humphrey was "operating for gas" on the leased premises. Brief for Appellants at 34 n.8.

[3] The Lease also allows the lessee to make payments to the lessor for any gas storage on the leased premises. However, the storage of oil or gas on the leased premises is not at issue in this case. *See* Brief for Appellants at 8 n.2.

operated acreage. Uncertain of the status of production and Seneca's continuing rights as of June 17, 2008, [] counsel for [the Appellants] drafted a letter inquiring as to the amount of acreage Seneca was still claiming under [the] Lease. In that same document, [the Appellants' counsel] advised Seneca of [the Appellants'] position that its failure to develop the gas bearing formations below the Tully limestone formation[4] constituted a breach of its implied covenant to produce.

When Seneca replied 2 months later, it [stated that it was] the rightful holder of 11,426 operated acres[,] on which 325 wells had been drilled, 131 of which were still producing gas, as well as 3,131 acres of unoperated land. It also claimed to have drilled 25 new wells between November 2007 and August 27, 2008[,] and announced its intention to drill an additional 15 in 2008, with 15 to 20 to follow in 2009. It further noted that it had made all requisite rental payments under the [] Lease through December 2008 – a fact that [the Appellants do] not dispute; denied that it had breached the implied covenant to develop; and rejected the position that Pennsylvania imposed an implied duty for a lessee to develop shallow and deep strata of a leasehold simultaneously.

In a follow-up letter dated December 18, 2008, [the Appellants] implicitly disagreed with much of Seneca's analysis. They instead took the position that when the primary term of the [] Lease expired …, Seneca became a tenant-at-will subject to termination with respect to further drilling operations. They also advised Seneca that the Lease itself only allowed it to hold the unoperated acreage in exchange for rental payments for 10 years and that [the Appellants were] immediately terminating [Seneca's] rights with respect to that acreage, as well. According to [the Appellants], Seneca's only remaining rights under the Lease were for the continued operation of producing wells and their corresponding acreage.

Approximately 1 week later, [the Appellants] entered into another gas and oil lease with Open Flow Gas Supply [Corporation ("Open Flow")]. On its face, that lease overlapped with the [] Lease[.]

---

4 Largely, the Marcellus shale is trapped between the Onondaga limestone beneath the shale, and the Tully limestone on top of the shale.

Trial Court Opinion, 9/11/13, at 3 (citations omitted, footnote added).

In a prior appeal, this Court set forth the ensuing procedural history as follows:

> [Seneca instituted an action against the Appellants and Open Flow.[5]]  In bringing this lawsuit, Seneca essentially sought a declaration that it had not breached the [] Lease, that [the Appellants] had breached the [] Lease, and that Open Flow intentionally interfered with the [] Lease.  It further averred that the [] Lease remained a valid contract, [] the Open Flow lease was invalid, [] Seneca retained all the oil and gas rights to the acreage, and [] Open Flow and [the] Appellants owned no gas rights in the land.  Seneca filed a first and second amended [C]omplaint.  The final [C]omplaint contained eight counts.
>
> The action was voluntarily discontinued as to Open Flow on February 13, 2012.  [The] Appellants filed an [A]nswer, [N]ew [M]atter, and eight counterclaims against Seneca.  Seneca then moved for partial summary judgment seeking the dismissal of three of the eight counterclaims filed by [the] Appellants against Seneca.  [The] Appellants responded and filed a [M]otion for summary judgment.  [The Motion] claimed that Seneca breached an implied duty to develop deep gas horizons under the acreage[,] and asked the [trial] court to declare that the deep gas horizons were forfeited from the [] Lease[,] so that any natural gas below 5,000 feet had reverted to [the] Appellants, as landowners.  On September 11, 2013, the trial court entered an [O]rder granting Seneca's [M]otion for partial summary judgment and dismissing three of [the] Appellants' counterclaims.  In the same order, the trial court denied [the] Appellants' [M]otion for summary judgment.
>
> The September 11, 2013 [O]rder was not a final, appealable order since this action remained pending against [the] Appellants[,] and [] five counterclaims remained pending against Seneca. …  Recognizing that the [O]rder was not a final order

---

[5] The parties stipulated that the action is limited to the release of 3,131 "unoperated" acres.  **See** Brief for Appellants at 11 n.4; **see also** Second Amended Complaint, 4/29/10, at 4 (stating that Seneca's predecessors released 7,833 acres of unoperated acreage and that Seneca holds 3,131 acres of unoperated land under the Lease).

that could be appealed immediately, on October 8, 2013, four weeks after the September 11, 2013 [O]rder was entered, [the] Appellants filed an [A]pplication for determination of finality pursuant to Pa.R.A.P. 341(c). The [Application] was granted on October 15, 2013.

***Seneca Resources v. S&T Bank***, 104 A.3d 59 (Pa. Super. 2014) (unpublished memorandum at 3-4) (footnote added, citation omitted).

Subsequently, the Appellants filed a Notice of Appeal of the September 11, 2013 Order. This Court quashed the appeal because the trial court had failed to act on the Appellants' Application, pursuant to Rule 341(c), within thirty days of the entry of its September 11, 2013 Order. ***See id***. (unpublished memorandum at 4-7). As a result, on December 2, 2014, upon stipulation of the parties, the trial court entered an Order granting summary judgment in favor of Seneca and disposing of all outstanding claims and counterclaims based upon its reasoning in entering the September 11, 2013 Order.

The Appellants filed a timely Notice of Appeal. The trial court ordered the Appellants to file a Pennsylvania Rule of Appellate Procedure 1925(b) concise statement. The Appellants filed a timely Concise Statement.

On appeal, the Appellants raise the following questions for our review:

1. Whether the lower court erred in holding that the [] Lease for land covering 25,000 acres was not severable as to the separately-defined "operated" and "unoperated" acreage under the express terms of the Lease[?]

2. Whether the lower court erred in refusing to apply Pennsylvania's well-entrenched doctrine of implied covenant to fully develop an oil and gas lease merely because the

"operated" portion of the leased property was already under development at the inception of the Lease[?]

Brief for Appellants at 7.

Our standard of review of a trial court's grant of summary judgment is well-settled:

A reviewing court may disturb the order of the trial court only where it is established that the court committed an error of law or abused its discretion. As with all questions of law, our review is plenary.

In evaluating the trial court's decision to enter summary judgment, we focus on the legal standard articulated in the summary judgment rule. Pa.R.C.P. 1035.2. The rule states that where there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law, summary judgment may be entered. Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law. Lastly, we will view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party.

*Thompson v. Ginkel*, 95 A.3d 900, 904 (Pa. Super. 2014) (citation and brackets omitted).

In their first claim, the Appellants contend that the trial court erred in concluding that the Lease was entire and not severable. Brief for Appellants at 19-20, 28. The Appellants argue that the Lease is severable as to the operated and unoperated acreage because its express terms separately define the duration of the Lease and the separate consideration for the

respective acreage. *Id*. at 19, 28. The Appellants point out that the consideration for the operated acreage "is in the form of royalties, that continue for a 40-year primary term, and as long thereafter as production continues." *Id*. at 19 (emphasis omitted). The Appellants assert "that the lessors had the right to terminate the Lease as to unoperated acres after the stated term expired and the acreage was not converted into royalty-based production acres." *Id*. The Appellants further assert that because the consideration for the unoperated acreage is in the form of delay rental payments at a scheduled rate, this portion of the Lease becomes a tenancy at will at the expiration of the primary term. *Id*. at 19, 26, 27. The Appellants claim that the trial court's reliance on ***Jacobs v. CNG Transmission Corp.***, 332 F. Supp. 2d 759 (W.D. Pa. 2004), in determining that the Lease was not severable, is misplaced. Brief for Appellants at 20-23, 28. The Appellants argue that unlike ***Jacobs***, where one part of the lease could satisfy performance of the other part, the payment of royalties for the operated acreage is not sufficient to hold the Lease beyond the primary term for the unoperated acreage. *Id*. at 22. The Appellants maintain that Seneca's obligations and considerations, *i.e.*, the requirement to *both* pay royalties for operated acreage and delay rentals to hold unoperated acreage, rendered the unoperated acreage severable. *Id*.

The Appellants further contend that the trial court made numerous conclusions in determining that the Lease is not severable, which are not

supported by the plain wording of the Lease. *Id*. at 23-28. Specifically, the Appellants claim that contrary to the trial court's finding that the Lease failed to differentiate the types of consideration for operated and unoperated acreages, the Lease clearly delineates different consideration for 10,000 unoperated acres and 15,000 operated acres. *Id*. at 23-24. The Appellants further argue that while the trial court weighed the Lease's description of the leased premises as "25,000 acres more or less," the terms of the Lease defined the premises to include "15,000 acres of operated acreage and 10,000 acres of unoperated acreage." *Id*. at 25. The Appellants maintain that the habendum clause only applied to the operated acreage, and the unoperated acreage became a tenancy at will at the expiration of the primary term. *Id*. at 26-27. The Appellants claim that any clarifying language sought by the trial court was unnecessary because of the parties' intent to separate the terms and consideration for unoperated and operated acreage. *Id*. at 27-28.

"[A] lease is in the nature of a contract and is controlled by principles of contract law." *T.W. Phillips Gas and Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012). "To show a breach of contract, a party must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *McCausland v. Wagner*, 78 A.3d 1093, 1101 (Pa. Super. 2013) (citation and quotation marks omitted). "When performance of a duty under a contract is due, any

nonperformance is a breach." **Id**.; **see also Jedlicka**, 42 A.3d at 267 (stating that "a party seeking to terminate a lease bears the burden of proof."). "If a breach constitutes a material failure of performance, the non-breaching party is relieved from any obligation to perform; thus, a party who has materially breached a contract may not insist upon performance of the contract by the non-breaching party." **McCausland**, 78 A.3d at 1101. Conversely, if a party breaches a contract, but still substantially performs its obligations, the breach is nonmaterial and the breaching party retains the right to enforce the contract. **Id**.

> The interpretation of any contract is a question of law and this Court's scope of review is plenary. Moreover, we need not defer to the conclusions of the trial court and are free to draw our own inferences. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation.

**Humberston v. Chevron U.S.A., Inc.**, 75 A.3d 504, 509–10 (Pa. Super. 2013) (quotation marks and citations omitted). Further, "[i]t is fundamental that one part of a contract cannot be so interpreted as to annul another part[,] and that writings which comprise an agreement must be interpreted as a whole." **Southwestern Energy Prod. Co. v. Forest Res., LLC**, 83 A.3d 177, 187 (Pa. Super. 2013) (citation omitted).

Our Supreme Court has recognized that

the traditional oil and gas "lease" is far from the simplest of property concepts. … Generally, however, the title conveyed in an oil and gas lease is inchoate, and is initially for the purpose of exploration and development.

If development during the agreed upon primary term is unsuccessful, no estate vests in the lessee. If, however, oil or gas is produced, a fee simple determinable is created in the lessee, and the lessee's right to extract the oil or gas becomes vested. A fee simple determinable is an estate in fee that automatically reverts to the grantor upon the occurrence of a specific event. The interest held by the grantor after such a conveyance is termed a possibility of reverter. Such a fee is a fee simple, because it may last forever in the grantee and his heirs and assigns, the duration depending upon the concurrence of collateral circumstances which qualify and debase the purity of the grant.

Within the oil and gas industry, oil and gas leases generally contain several key provisions, including the granting clause, which initially conveys to the lessee the right to drill for and produce oil or gas from the property; the habendum clause, which is used to fix the ultimate duration of the lease; the royalty clause; and the terms of surrender.

\*\*\*

Typically … the habendum clause in an oil and gas lease provides that a lease will remain in effect for as long as oil or gas is produced "in paying quantities." Traditionally, use of the term "in paying quantities" in a habendum clause of an oil or gas lease was regarded as for the benefit of the lessee, as a lessee would not want to be obligated to pay rent for premises which have ceased to be productive, or for which the operating expenses exceed the income.

*Jedlicka*, 42 A.3d at 267-68 (citations, brackets, and some quotation marks omitted).

Additionally, in conjunction with the leasing and habendum clauses, "leases also began to incorporate 'delayed rental' clauses, which relieved the

lessee of the obligation to develop the property immediately upon entering into an agreement." ***Hite v. Falcon Partners***, 13 A.3d 942, 946 (Pa. Super. 2011). The rental "payments are in the nature of liquidated damages for the lessee's decision to forego production and are viewed as the consideration paid to the landowner in lieu of the royalty that would be paid if production operations were to be undertaken immediately." ***Id***. at 946-47 (citation omitted). The payment of a delay rental to postpone the exploration and development of a property and maintain the effectiveness of the lease is limited to the primary term of the lease. ***Id***. at 947.

In determining whether an oil and gas lease is severable, our Supreme Court, in ***Jacobs v. CNG Transmission Corp.***, 772 A.2d 445 (Pa. 2001), explained that

> there is no bright line rule requiring that a court first find that the intent of the parties is unclear as to entirety/severability before it may look to factors such as the conduct of the parties and the character of the consideration to determine whether an agreement is entire or severable. The central task is to ascertain the intent of the parties. That intent may be apparent from the explicit language of the [lease] … or it may be obvious from a "construction" of the agreement, including the nature of the consideration[.[6]] … In short, principles of construction may reveal the intent of the parties no less than the actual language addressing entirety/severability. Thus, … absent express

---

[6] "[T]he character of the consideration may determine the severability of the contract." ***Jacobs***, 772 A.2d at 451 (citation omitted). "[I]f the consideration is single, the contract is entire ... whatever the number or variety of items embraced ... but, if the consideration is apportioned, either expressly or by necessary implication ... the contract will generally be held to be severable...." ***Id***. (citation omitted); ***see also Jacobs***, 332 F. Supp. 2d at 775 (stating that the fact that the parties apportioned the consideration does not automatically render the agreement severable).

language that a [lease] is entire, a court may look to the [lease] as a whole, including the character of the consideration, to determine the intent of the parties as to severability and may also consider the circumstances surrounding the execution of the [lease], the conduct of the parties, and any other factor pertinent to ascertaining the parties' intent. The court need not make a specific predicate finding of ambiguity before undertaking the inquiry[;] indeed, if the contract were crystal clear as to the parties' intent, severability likely would not be a contested issue.

*Jacobs*, 772 A.2d at 452 (footnote added).[7]

Here, the Lease states the following, in relevant part:

… Lessor does hereby grant, demise, lease and let unto the said Lessee, its successor or assigns the hereinafter described "leased

---

[7] The Supreme Court of Pennsylvania's decision in *Jacobs*, addressing whether an oil and gas lease is severable, was in response to a Petition for Certification of Questions of Law from the United States Court of Appeals for the Third Circuit. *See Jacobs*, 772 A.2d at 446. The Supreme Court, while announcing the rule regarding severability, did not analyze the lease at issue in the *Jacobs* case. Instead, the United States District Court for the Western District of Pennsylvania resolved the case. In *Jacobs*, the oil and gas lease was a production and storage lease, which had a primary term of ten years, but could be extended indefinitely by either the production or storage of gas. *Jacobs*, 332 F.Supp.2d at 765. Under the lease, the lessor received consideration that took several forms: (1) royalties from producing wells; (2) free gas; (3) delay rental when no wells yielding royalties have been drilled and no payments for storage of gas are due and payable; and (4) payment for storage privileges. *Id*. at 766-67. During the primary term of the lease, the lessee utilized the property to store gas, but did not drill any oil or gas wells on the property. *Id*. at 768. As a result, the lessor filed an action, claiming that the production and storage provisions of the lease were severable. *Id*. at 769. The district court concluded that the lease was not severable because the leasing clause and the habendum clause did not address distinct contractual undertakings, but rather indicated that the "production and storage were interrelated components of developing the leasehold." *Id*. at 778. The trial court further found that the lessee's obligation to pay delay rentals, royalties, and storage rentals evidenced the parties' intent to enter into the lease with the single objective of operating the premises in a manner designed to achieve the fullest development of both production and storage rights. *Id*. at 783.

premises," for the sole and only purpose of drilling and operating for oil and gas, of storing gas in any formations underneath the surface, and withdrawing therefrom gas originally produced from other lands, and of laying such pipe lines and building such tanks, stations and structures thereon, and drilling any water well or wells as may be necessary to produce, store, withdraw and transmit such oil and gas covering 25,000 acres more or less, situate in Elk and Jefferson Counties, Pennsylvania.

Said "leased premises" total 25,000 acres more or less in Jefferson and Elk Counties, Pennsylvania, and include all oil and gas lands owned by Lessor in said Counties[.]

\*\*\*

This lease shall be for a term of forty (40) years and as long thereafter as oil or gas or either of them is stored in, produced or withdrawn from all or any portion of said leased premises by the Lessee, its successors or assigns, subject to payments and cancellation as hereinafter set forth.

IN CONSIDERATION OF THE PREMISES[,] the Parties hereto agree as follows:

1. Lessee agrees to deliver to the credit of the Lessor, its successors or assigns free of cost in the pipe line to which it may connect its wells, the equal one-eighth (1/8th) part of all oil produced and saved from the leased premises.

2. That 10,000 acres more or less of the leased 25,000 acres are not presently under development (unoperated) and that 15,000 acres of the leased 25,000 acres are developed (operated) and the unoperated and operated acreage shall be subject to the terms and conditions hereinafter set forth as to each. … However, should any of the unoperated acreage become productive at any future date, the terms and conditions relating to the operated acreage will become applicable.

3. Lessee agrees to pay Lessor annually in advance for the 10,000 acres (unoperated) as follows:

a. <u>Year</u>     <u>Lump Sum or Rental Payment</u>
  1962        $10,000
  1963   9,000.00 or $1.00 per acre, whichever is greater

| | |
|---|---|
| 1964 | 8,000.00 or $1.00 per acre, whichever is greater |
| 1965 | 7,000.00 or $1.00 per acre, whichever is greater |
| 1966 | 6,000.00 or $1.00 per acre, whichever is greater |
| 1967 | 5,000.00 or $1.00 per acre, whichever is greater |
| 1968 | 4,000.00 or $1.00 per acre, whichever is greater |
| 1969 | 3,000.00 or $1.00 per acre, whichever is greater |
| 1970 | 2,000.00 or $1.00 per acre, whichever is greater |
| 1971 | 1,000.00 or $1.00 per acre, whichever is greater |
| 1972 | $1.00 per acre |

\*\*\*

5. It is understood and agreed between the Parties hereto that Lessee shall have the right to define or designate any part or parts of the leased land (25,000 acres more or less) as a gas storage area or areas; and in that event, in lieu of the payment called for in paragraphs 3 and 4 hereof, payment for said gas storage area shall be made annually in advance, at the rate of $200.00 per well or $2.00 per acre, whichever is greater in said defined area.

Lease, 4/17/62, at 1, 2-3, 4-5.

The language of the Lease does not expressly state that it is entire. Thus, consonant with **Jacobs**, we must consider whether the unoperated acreage terms were severable from the operated acreage terms by examining the Lease's language, the character of the consideration, the circumstances surrounding the lease's execution, conduct of the parties, and any discernible intent of the original contracting parties that could be derived from the Lease. **See Jacobs**, 772 A.2d at 452.

According to the Lease, the parties explicitly agreed that the "leased premises" encompass 25,000 acres for a primary term of 40 years and a secondary term that would continue indefinitely in its entirety as long as oil or gas was produced or withdrawn from **any** portion of the leased premises.

- 14 -

Neither the leasing clause nor the habendum clause makes any distinction between operated and unoperated acreage in specifying the leased premises. Further, there is no indication in these clauses suggesting that the Lease could be extended beyond the expiration of the primary term as to the operated acreage, while expire as to the unoperated acreage for failing to produce or withdraw gas. Thus, the clear and unambiguous language of the Lease grants Seneca a fee simple determinable of the entire leasehold, so long as the lessee stores, produces, or withdraws oil or gas from any portion of the 25,000 acres. **See Jedlicka**, 42 A.3d at 267; **see also Sabella v. Appalachian Dev. Corp.**, 103 A.3d 83, 103 (Pa. Super. 2014) (stating that "an oil and gas lease, upon vestiture arising from successful discovery and production of oil, conveys a potentially indefinite fee simple determinable.").

While the Lease provides separate consideration for the unoperated and operated acreage, the character of the lessee's duties of payment does not support the Appellants' argument that the Lease is to be construed as severable. The Lease provides that the lessor is entitled to royalties earned from the production on the operated acreage of the leased premises. Lease,

4/17/62, at 2.[8] Further, the Lease provided for monetary compensation with respect to the "unoperated" acreage to provide the lessor with revenue over this land for a period of ten years. *See* Trial Court Opinion, 9/11/13, at 6 (stating that "the lessor would not realize any revenue from the unoperated acreage without instituting a payment scheme unrelated to production or storage."). Although the Lease does not expressly state that consideration for the unoperated acreage should continue after 1972, the parties do not dispute that Seneca paid the consideration until December 2008, six years after the end of the 40-year term. *See, e.g.,* Brief for Appellee at 23; Brief for Appellant at 11, 44. Importantly, the Lease permits conversion of the unoperated acreage to operated acreage by commencing production at any time, and does not limit conversion to either the 10-year term (1972) or the 40-year term (2002). *See* Lease, 4/17/62, at 3 (stating that "should any of the unoperated acreage become productive **at any future date**, the terms and conditions relating to the operated acreage will become applicable.") (emphasis added). Moreover, the Lease explicitly states that any portion of the "leased premises" could be designated for storage, and payment for storage would be in lieu of any royalties or rental payments. *See* Lease, 4/17/62, at 4-5.

---

[8] The Lease only identifies royalties due to the production of oil; however, Seneca concedes that it also pays royalties from the production of gas on the leased premises. *See* Brief for Appellee at 3 (stating that "[i]n accordance with the Lease, Seneca timely paid, and continues to pay, the [Appellants] royalties earned based on the volume of gas produced from the leased acreage.").

Thus, the fact that consideration provisions include royalties, delay rentals, and storage rentals, and that unoperated acreage may be converted to operated acreage at any time, reflect an intent by the parties to enter an agreement to achieve the fullest development of the entire 25,000 acres of the leased premises. **See Penneco Pipeline Corp. v. Dominion Transmission, Inc.**, 2007 WL 1847391, *16 (W.D. Pa. 2007) (stating that the compensation provisions did not evidence a severable lease where the "delay rentals, royalties, and storage rentals, are not distinctly allocated to production or storage rights, but rather, are written in such a way that payment for one purpose interrelates and impacts on the payment for the other."); **Jacobs**, 332 F.Supp.2d at 783 (concluding that "[t]he provisions of consideration under the lease are not distinctly allocated to the dual purposes identified in the leasing clause, but instead are drafted in such a manner that payment for one purpose interrelates to and impacts on the payment for the other."); **see also McCausland**, 78 A.3d at 1101 (stating that "[r]oyalty-based leases are to be construed in a manner designed to promote the full and diligent development of the leasehold for the mutual benefit of both parties.") (citation omitted).

Furthermore, with regard to the other **Jacobs** factors, we note that the parties had entered into the Agreement four months prior to the Lease. In the Agreement, the parties identified the total land to be leased as 25,000 acres. Agreement, 1/1/62, at 2 (unnumbered). Additionally, in 1974, the

Appellants assigned their rights to certain acreage implicated by the Lease to Koppers Company, Inc. ("Koppers").[9]    Assignment, 6/3/74, at 1 (unnumbered).   In the Assignment, the Appellants clearly stated that the conveyance was subject to the rights provided to Jefferson under the Lease. *Id*.   Importantly, the Appellants stated that under the Lease, they "leased unto [Jefferson] 25,000 acres of land for the exploration and development of oil and gas under the terms and conditions therein set forth[.]" *Id*.   These documents evidence that the Appellants understood that the "leased premises" includes 25,000 acres, not separate and severable operated and unoperated acreages.[10]

Based upon the foregoing, we conclude the Lease is entire, and that the operable and unoperable acreages are not severable.

---

[9] Seneca claims that certain parcels assigned to Koppers were designated by the Lease as unoperated acreage. *See* Brief for Appellee at 24.

[10] In their Statement of the Case, the Appellants cite to a 1990 lease they entered into with Empire Exploration, Inc. ("Empire").  Brief for Appellants at 12-13.   Purportedly, this lease covered 594 acres of unoperated acreage listed in the Lease, and expired in December 2008, with no drilling of the land. *Id*.; *see also* Brief for Appellee at 25.  The Appellants claim that the 1990 lease confirmed that the title to the unoperated portion of the Lease reverted to the lessor.  Brief for Appellants at 13.  However, the Appellants did not raise the 1990 lease with Empire in their Argument section, or argue that this lease supports the proposition that the Lease is severable. *See* Pa.R.A.P. 2117(b) (stating that "[t]he statement of the case shall not contain any argument."); *see also* Pa.R.A.P. 2119(a).   In any event, we note that the Appellants and Empire entered into a "Protective" oil and gas lease.  1990 Protective Lease, 12/14/90, at 1 (unnumbered).  Specifically, the 1990 lease stated that "no royalties, or rentals to deter commencement of drilling operations, shall be paid or delivered hereunder until LESSOR'S interest in the land above described has been finally determined by a court of competent jurisdiction." *Id*. at 4 (unnumbered).

In their second claim, the Appellants contend that the trial court erred in refusing to apply Pennsylvania's doctrine of implied covenant to fully develop an oil and gas lease for the 3,131 acres of unoperated land.[11]  Brief for Appellants at 29, 38.  The Appellants argue that the trial court's determination that the operated acres of the leased property were already in development at the inception of the Lease abrogates the doctrine of implied covenant to develop the unoperated acreage is erroneous.  *Id*. at 29, 33-34, 38.  The Appellants assert that the implied covenant to develop imposes an obligation on the lessee to develop the entire leased premises, and to hold otherwise would allow lessees to hold a vast amount of undeveloped land in perpetuity.  *Id*. at 34, 38.  The Appellants claim that Seneca is obligated to demonstrate that it acted with reasonable diligence to develop the land, and by failing to do so, must explain and excuse the lack of activity.  *Id*. at 39-41, 44.  The Appellants point out that Seneca has only drilled wells in the operated acres of the Lease, and has failed to develop the 3,131 acres of unoperated land, despite the land being commercially viable.  *Id*. at 42-43, 44.  The Appellants argue that because the unoperated acreage was

_____

[11] Paragraph 10 of the Lease states the following:

> All expressed or implied covenants of this lease shall be subject to all Federal and State laws, executive orders, rules or regulations, and this lease shall not be terminated in whole or part, nor Lessee held liable in damages, for failure to comply therewith if compliance is prevented by, or if such a failure is the result of, any such law, order, rule or regulation.

Lease, 4/17/62, at 7.

commercially viable, and Seneca has failed to explain its failure to develop the land, the implied covenant to develop has been breached and the Appellants are entitled to enter into a new oil and gas production agreement with another party. *Id*. at 43-45.

In Pennsylvania, "[a]n implied covenant to develop the underground resources appropriately exists where the only compensation to the landowner contemplated in the lease is royalty payments resulting from the extraction of that underground resource." *Jacobs*, 772 A.2d at 455; *see also id*. at 454 (stating that "[t]he basis for the implied covenant … is a recognition that the lessor has entered into a bargain expecting to be compensated for the lease of the land, and principles of fairness dictate that the lessee be obligated to make diligent efforts to ensure that the lessor receives the benefit of his bargain."); *Hite*, 13 A.3d at 946 (noting that "[e]ven when such an obligation was not expressed, the courts recognized an implied covenant to develop the leasehold."). However, while the implied covenant to develop doctrine exists, "the specific agreement of the parties may preclude the application of the doctrine." *Jacobs*, 772 A.2d at 455; *see also Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 388 (Pa. 1986) (stating that "[t]he law will not imply a different contract than that which the parties have expressly adopted. To imply covenants on matters specifically addressed in the contract itself would violate this doctrine."). For example, where "the parties have expressly agreed that the landowner shall

be compensated if the lessee does not actively extract the resource, then the lessee has no implied obligation to engage in extraction activities." *Jacobs*, 772 A.2d at 455; *see also id*. (stating that "so long as the lessee continues to pay the landowner for the *opportunity* to develop and produce oil or gas, the lessee need not actually drill wells.") (emphasis added). "At the point where that compensation ceases due to the expiration of the term of the lease, or pursuant the terms of the lease itself, the lessee then has an affirmative obligation either to develop and produce the oil or gas or terminate the landowner's contractual obligations." *Id*.

Here, the trial court, relying on our Supreme Court's decision in *Jacobs*, found that because a portion of the leased premises was already developed at the time Seneca acquired the rights to the Lease, the implied covenant to develop was inapplicable to the property as a whole. *See* Trial Court Opinion, 9/11/13, at 7 (stating that "because Seneca assumed the role of lessee to [the] Lease already developed by its predecessors—activities attributed to Seneca as successor in interest—the implied covenant to develop is no longer applicable to the Lease."). While an implied covenant to develop oil or gas exists in Pennsylvania, *see Jacobs*, 772 A.2d at 455, the fact that lessees enter into a lease where land had already been partially developed by its predecessors does not alone preclude the obligation to develop the remainder of the land. *See Hill v. Joy*, 24 A. 293, 293 (Pa. 1892) (stating that where the lessee operated 90 acres of land, while leaving

190 acres of unoperated land, there is an implied covenant on the lessee's part to work the mine in a proper manner and with reasonable diligence, so that the lessor receives the compensation which both parties contemplated when entering into the lease); *see also Delmas Ray Burkett, II Revocable Trust ex rel. Burkett v. Exco Resources (PA), LLC*, 2014 WL 585884, *8 (W.D. Pa. 2014) (interpreting *Jacobs* and concluding that "when an oil and gas lease is held by production, this status does not negate application of the implied covenant of development."); *see generally Sauder v. MidContinent Petroleum Corp.*, 292 U.S. 272, 281 (1934) (holding that the lessee of an oil and gas lease who produced oil on a forty-acre tract, but abstained from drilling on an adjacent section of land, could not hold the undeveloped part of the land indefinitely without drilling or establishing an intention to drill in the future; as a result, the lessor was equitably entitled to cancel the lease).[12]  In point of fact, leases where payments are based on production royalties are to be "construed in a manner designed to promote the **full and diligent development of the leasehold** for the mutual benefit of both parties."  *Hite*, 13 A.3d at 945 (emphasis added); *see also Jacobs*, 772 A.2d at 454 (stating that "[t]he basis for the implied covenant … is a recognition that the lessor has entered

---

[12] We note in *Stoddard v. Emery*, 18 A. 339, 339 (Pa. 1889), the Pennsylvania Supreme Court held that where the number of wells to be drilled is specified by a lease, that number controls and no implied covenant to develop further can be read into the lease.  However, as noted above, the Lease does not fix the number of wells to be drilled and/or operated.  Thus, *Stoddard* is inapplicable to the instant case.

into a bargain expecting to be compensated for the lease of the land, and principles of fairness dictate that the lessee be obligated to make diligent efforts to ensure that the lessor receives the benefit of his bargain."). Significantly, the **Jacobs** Court, without limitation to leases where no production has taken place, maintained that a "defendant cannot hold the premises and refuse to operate them." **Jacobs**, 772 A.2d at 455.

Thus, the fact that the leased premises are under production at the time of the entry of the Lease does not, in itself, invalidate the implied covenant to develop. Accordingly, the trial court's reasoning in granting summary judgment in favor of Seneca on the implied covenant to develop claim was erroneous. However, this does not end our discussion, as we must scrutinize the plain language of the Lease to determine whether it precludes the application of implied covenant to develop. **See Jacobs**, 772 A.2d at 455.[13]

It is undisputed that the Appellants and Seneca were operating under the habendum clause of the Lease, which provides that the Lease would be extended, beyond the primary term of 40 years, if "oil or gas or either of them is stored in, produced or withdrawn from all or **any portion of said leased premises**[.]" Lease, 4/17/62, at 2 (emphasis added). As noted above, the leased premises was comprised of approximately 25,000 acres,

---

[13] It is well-settled that "we may affirm the trial court's order on any valid basis." **Plasticert, Inc. v. Westfield Ins. Co.**, 923 A.2d 489, 492 (Pa. Super. 2007).

including the 3,131 acres at issue here, and did not constitute separate operated and unoperated acreages. *Id*. at 1. It is undisputed that Seneca continues to drill and withdraw gas from a portion of the leased premises. *See* Brief for Appellants at 11, 42; Brief for Appellee at 3-4, 29-30, 36; *see also* Trial Court Opinion, 9/11/13, at 3.

Thus, as the parties have stipulated that the drilling and operating requirements under the Lease are satisfied, the Lease will extend for an indefinite secondary term as long as any portion of the leased premises are being drilled or operated for the production of oil or gas. *See Hutchison*, 519 A.2d at 388 (stating that the law does not imply a different contract than that which the parties have expressly adopted). Indeed, as noted in the above discussion regarding severability, the Lease makes no mention of any duty or mandate to drill or operate the unoperated acreage for the production of gas to continue the Lease as to that acreage in full force and

effect.[14] **See Jacobs**, 772 A.2d at 453. Based upon the foregoing, we conclude that the Lease between the Appellants and Seneca forecloses a finding of a breach of the implied covenant to develop and produce oil and gas on the unoperated acreage. **See Caldwell v. Kriebel Res. Co., LLC**, 72 A.3d 611, 615 (Pa. Super. 2013) (concluding that the implied duty to develop various strata was inapplicable where the parties were operating under the habendum clause of their agreement, which provided that the agreement would be extended "so long as oil or gas was being produced," and the drilling activities to date had involved only shallow gas drilling); **see also Exco Resources (PA), LLC**, 2014 WL 585884, *7-8 (holding that implied covenant to develop acreage outside that drained by the current wells, and the entire premises below 3,500 feet, did not apply where the parties' agreement extended for an indefinite secondary term so long as,

---

[14] We note that the Lease required Seneca to pay delay rental payments to the Appellants on the unoperated acreage for a period of ten years beginning in 1962. Lease, 4/17/62, at 3. While the Lease does not expressly state that consideration for the unoperated acreage should continue after 1972, Seneca continued to pay the Appellants $1.00 per unoperated acre until December 2008, six years after the end of the 40-year primary term of the Lease. **See** Brief for Appellee at 23; Brief for Appellants at 11, 44. The Appellants' acceptance of Seneca's sustained delay rental payments during the primary term of the Lease established that Seneca did not have an implied covenant to develop during that time. **See Jacobs**, 772 A.2d at 455; **see also Hite**, 13 A.3d at 949 (stating that the mere payment of a delay rental beyond the end of the primary term of the lease does not extend the lease for an indefinite term or create a fee simple determinable in the lessee).

*inter alia*, the premises are being drilled or operated for the production of oil or gas).[15]

Based upon the foregoing, we affirm the trial court's entry of summary judgment in favor of Seneca.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: <u>8/31/2015</u>

---

[15] The Appellants cite to numerous cases to support their argument. However, upon our review of the Lease, the actions of the parties during the primary and secondary terms of the Lease, and relevant case law, we deem the cases cited by the Appellants to be inapposite to the case at bar.