J-A05006-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| DAVID C. BALINT, KAYLA D. BALINT, BRUCE E. GRANDEL, STEPHANIE GRANDEL, AND LOLA DRILLING, II, LLC | : : : : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | | |
| EQT PRODUCTION COMPANY | | No. 301 WDA 2024 |
| APPEAL OF: LOLA DRILLING, II, LLC | | |

Appeal from the Order Entered February 15, 2024
In the Court of Common Pleas of Greene County Civil Division at No(s):
A.D. 527-2019

| | | |
|---|---|---|
| DAVID C. BALINT, KAYLA D. BALINT, BRUCE E. GRANDEL, STEPHANIE GRANDEL, AND LOLA DRILLING, II, LLC | : : : : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | | |
| EQT PRODUCTION COMPANY | | No. 302 WDA 2024 |
| APPEAL OF: DAVID C. BALINT, KAYLA D. BALINT, BRUCE E. GRANDEL AND STEPHANIE GRANDEL | | |

Appeal from the Order Entered February 15, 2024
In the Court of Common Pleas of Greene County Civil Division at No(s):
A.D. 527-2019

BEFORE:  MURRAY, J., KING, J., and FORD ELLIOTT, P.J.E.*

---

* Retired Senior Judge assigned to the Superior Court.

MEMORANDUM BY MURRAY, J.:                    **FILED: June 3, 2025**

David C. Balint, Kayla D. Balint, Bruce E. Grandel, Stephanie Grandel (together, Owners), and LOLA Drilling, II, LLC (LOLA) (collectively, Appellants) appeal from the order entering summary judgment against them and in favor of EQT Production Company (EQT). Appellants alleged EQT failed to renew an oil and gas lease on Owners' property (the lease or EQT's lease) and removed gas from the property after the lease's expiration. EQT maintained it extended the lease by drilling on the property before the expiration date. The trial court granted EQT's motion for summary judgment, determining there was no genuine issue of material fact that EQT had engaged in activities sufficient to extend the lease. After careful review, we affirm.

On July 23, 2008, Owners executed an oil and gas lease with Range Resources – Appalachia, LLC (RRA), covering two adjacent parcels in Springhill Township, Greene County, Pennsylvania, comprising approximately 101 acres (the property, Owners' property, or the premises). *See* EQT's Motion for Summary Judgment (MSJ), 2/16/23, Exhibit A (Lease, 7/23/08), ¶ 1. The lease provided for a primary term of five years, which the parties agreed to extend for another five years, such that the primary term would expire on July 23, 2018. At some point during the primary term, EQT acquired RRA's interest in the lease.

Regarding its continuation beyond the primary term, the lease provides:

> This lease shall continue in force and the rights granted hereunder be quietly enjoyed by the Lessee for a term of five (5) years [(the

primary term)] and so much longer thereafter as oil or gas or their constituents are produced or are capable of being produced on the premises in paying quantities, in the judgment of the Lessee, or as the premises shall be operated by the Lessee in the search for oil or gas….

*Id.*, ¶ 2.  The lease further provides that "Lessor agrees … no other lease for the oil, gas, and minerals covered by this lease shall be granted by the Lessor during the term of this lease or any extension or renewal thereof granted to the Lessee herein."  *Id.*, ¶ 19.

David C. Balint (Mr. Balint) testified at his deposition that

[a]round April or May [of 2018,] I started calling the land agents at EQT … to see if there is any activity on our lease, if it was held, or if it wasn't going to be held, if they were interested in renewing the lease, because I was interested in continuing a partnership and working with them, if they were interested[.]

I had left messages for the land agents.  …  And then after that, later on, when we never received any return phone calls, and it was coming up to a time frame that was close to the expiration date of our lease in July, I don't recall the exact date, I called EQT, and I spoke with a female that was very helpful.

I told her that I needed her help, and was just trying to find out what was going on with our lease.  It was getting ready to expire.

And she related to me that she was looking inside the land agent software, and that there were certain fields that there wasn't any data in.  And if there wasn't any data in those fields, then your lease—there wasn't any activity to hold it.

That was the conversation.  I believe I asked her for a writing at that point.  …  I believe I made, after that phone call, one additional [phone call around the end of July or early August] to try to obtain something … in writing.

Owners' Response in Opposition to MSJ, 4/3/23, Exhibit A (Mr. Balint Deposition Transcript, 3/28/22), at 45-47.

On August 2, 2018, Owners executed an oil and gas lease with LOLA, covering the same property. **See id.**, Exhibits E, F (LOLA Lease, 8/2/18).

On August 7, 2018, EQT's landowner relations department sent an email to Mr. Balint, stating: "The expiration date of the lease has passed without EQT extending or holding this agreement. We have decided not to extend or renew this lease." MSJ, Exhibit K (EQT Email, 8/7/18).

However, several months later, EQT claimed its communications with Mr. Balint had been mistaken, that it had in fact drilled a productive natural gas well on the property, and its drilling activities had effectuated the extension of the lease.

On December 27, 2018, EQT recorded a "Declaration—Notice of Allocation Area," which stated, in pertinent part:

> NOTICE is hereby given that effective July 1, 2018, in reasonable judgment in good faith, EQT … has allocated the oil and gas leasehold estates in the following described leases attached hereto as Exhibit A, in Springhill Township, Greene County, Pennsylvania, to form an allocation area containing 581.74 acres, more or less (the "William Lane 2").

**Id.**, Exhibit F (William Lane 2 Declaration, 12/27/18), at 1. The declaration's Exhibit A identified Owners' property and dozens of other parcels in Springhill Township. **See** William Lane 2 Declaration, Exhibit A.[1]

---

[1] Regarding pooling or "unitization," the lease provides:

> Lessor hereby grants to the Lessee the right at any time to consolidate the leased premises or any part thereof or strata

*(Footnote Continued Next Page)*

- 4 -

In late December 2018, EQT sent a copy of the declaration to Mr. Balint, who then contacted EQT to inquire about it. *See* Owners' Response in Opposition to MSJ, 4/3/23, ¶ 12. On January 7, 2019, EQT's landowner relations department sent an email to Mr. Balint, stating the lease

> is actually HOPS [(held by operations)] and just went to TIL [(turned in line)[2]] in November of 2018. You should actually start to see Royalty Payments in the next month or two. I do apologize for the miscommunication earlier sent to you by another CSR/Land Analyst. Because [EQT's] Division Order department was recently still working on the Unit and getting it set up, the process hadn't reached the leasing department to update the actual lease. So that is the information the leasing analyst was going by when [the analyst] said [the lease] was not extended. It was actually extended in 2013[,] then went to Held by Operations to now being Held by Production. Your lease is in the William Lane Unit – Well Number 596148. That is why you received the Division Order. I hope this helps clear up any confusion.

MSJ, Exhibit K (EQT Email, 1/7/19) (footnote added).

_____

> therein with other lands to form an oil and gas development unit … for the purpose of drilling a well thereon…. Any well drilled on said development unit whether or not located on the leased premises, shall nevertheless be deemed to be located upon the leased premises within the meaning and for the provision and covenants of this lease to the same effect as if all the lands comprising said unit were described in and subject to this lease…. Lessee shall effect such consolidation by executing a declaration of consolidation with the same formality as this oil and gas lease setting forth the leases or portions thereof consolidated, the royalty distribution and recording the same in the recorder's office … and by mailing a copy thereof to the Lessor…. Lessee shall have the right to amend, alter or correct any such consolidation at any time in the same manner as herein provided.

Lease, 7/23/08, ¶ 10.

[2] "'Turned in line' refers to the point when sales from a well begin." EQT's Brief at 13 n.3.

In January 2019, EQT began sending Owners royalty checks for natural gas produced in the William Lane 2 Unit. *See* Mr. Balint Deposition Transcript, 3/28/22, at 84. Owners refused to cash the checks. *See id.*; *see also* MSJ, Exhibit I (Stephanie Grandel Deposition Transcript, 6/1/22), at 66.

On July 5, 2019, Appellants initiated the instant civil action against EQT. In their second amended complaint, Appellants alleged the lease "expired on or about July 23, 2018[,] because it was neither extended, nor was a well ever drilled, and no operations were commenced, during the primary or extended [primary] terms of the" lease. Second Amended Complaint, 9/9/20, ¶ 55. Appellants asserted six causes of action: (1) quiet title, on the grounds that EQT's lease expired and LOLA's subsequent lease is the only enforceable lease on the property; (2) slander of title, arising from EQT's allegedly false claim that its lease remains in effect; (3) ejectment, (4) trespass, and (5) conversion, each arising from EQT's extraction of natural gas from the property after its lease allegedly expired; and (6) tortious interference with contractual relations between Owners and LOLA. *See id.*, ¶¶ 54-118.

Appellants sought relief including, *inter alia*, compensatory and punitive damages, *see id.* ¶¶ 70, 79, 96, 106, 117-18; an order barring EQT from asserting any leasehold interest in the property and declaring LOLA's lease the only enforceable lease, *see id.* ¶ 62; an order directing EQT to remove its equipment from the property and shut down any wells "that enter upon or are planned to enter upon" the property, *id.* ¶ 79; and an order requiring EQT to

disgorge "unlawfully obtained gains" and enjoining it from "conducting any further oil and gas production that would hinder, interfere with, compromise, damage or harm any existing oil and gas underlying" the property, *id.* ¶ 96.

EQT filed an answer and new matter, averring it extended the lease through its drilling activities initiated before the primary term expired. *See* Answer and New Matter to Second Amended Complaint, 9/28/20, ¶ 18. EQT admitted its landowner relations department initially told Mr. Balint the lease had expired, but averred those statements were mistaken and made without authority. *Id.*, ¶ 28. EQT averred its January 7, 2019, email corrected the mistaken statements. *Id.* EQT further maintained that, because its lease remained in effect, LOLA's lease was invalid. *Id.*, ¶ 26 (citing Lease, 7/23/08, ¶ 19).

On February 16, 2023, after the parties completed discovery, EQT moved for summary judgment. EQT argued all six of Appellants' claims relied on the allegation that the lease expired at the end of the primary term. *See* MSJ, ¶ 14. EQT asserted

> [t]he undisputed record evidence shows EQT drilled an oil and gas well under the property before the expiration of the primary term of EQT's lease[,] which was sufficient to continue EQT's lease under its express terms and applicable law. [EQT's] later miscommunication stating that EQT's lease had not been extended or held by operations does not alter the validity of EQT's lease[,] as [the miscommunication] was plainly errant based on facts already known to [Appellants] and of public record.

*Id.*, ¶¶ 15-16 (paragraph breaks and numbers omitted; some capitalization modified).

In support of its motion, EQT attached documents reflecting its drilling activities. ***See generally id.***, Exhibits A-Q. In October 2017 and March 2018, EQT applied for well permits covering Owners' property and other parcels later included in the William Lane 2 Unit; the Pennsylvania Department of Environmental Protection (DEP) issued the permits. ***See id.***, Exhibit P (October 11, 2017, well permit for William Lane 2H); Exhibit O (March 13, 2018, well permit for William Lane 4H). In December 2017 and March 2018, EQT began work in preparation for drilling two wells, William Lane 2H and William Lane 4H, including setting conductors. ***See id.***, Exhibit D (December 12, 2017-May 4, 2019, EQT Daily Drilling Reports for William Lane 2H); Exhibit B (March 11, 2018, EQT Drilling Partner Report for William Lane 4H). Horizontal drilling on the William Lane 4H well began on July 16, 2018, and concluded on September 3, 2018. ***See id.***, Exhibit C (DEP Well Record for William Lane 4H, indicating "Bottom Hole Drilling 7/16/2018-9/3/2018").[3]

EQT also attached to its MSJ a map (the map) indicating it drilled the William Lane 4H wellbore through Owners' property on July 21, 2018—two days before the lease's primary term expired. ***Id.***, Exhibit E.

Owners and LOLA filed separate responses in opposition to EQT's MSJ. Appellants contended "the issue of whether EQT commenced operations in search for oil or gas in good faith on [the property] prior to July 23, 2018[,]

---

[3] Drilling on the William Lane 2H well began on April 21, 2019, and concluded on May 4, 2019. ***See*** MSJ, Exhibit D.

is a question of fact for the jury." Owners' Response in Opposition to MSJ, 4/3/23, ¶ 15; LOLA's Response in Opposition to MSJ, 4/3/23, ¶ 15. In support of this contention, Appellants relied heavily on EQT's statements to Mr. Balint in July/August 2018, which EQT later claimed were mistaken.

Appellants argued the map was hearsay and did not satisfy the business records exception of the hearsay rule. Appellants argued EQT needed oral testimony to explain the map's assertion that the William Lane 4H wellbore penetrated the property on July 21, 2018. Appellants further argued that the rule set forth in ***Nanty-Glo Borough v. Am. Surety. Co.***, 163 A. 523, 524 (Pa. 1932), would preclude summary judgment on the basis of any such oral testimony. Appellants also argued that because EQT did not record the William Lane 2 Declaration until December 2018, the unitization was not in effect on July 23, 2018. Therefore, Appellants maintained, EQT's activity on other nearby parcels before July 23, 2018, did not constitute activity on Owners' property for the purpose of extending the lease. Finally, Appellant argued that the doctrine of equitable estoppel barred EQT from repudiating its July/August 2018 statements to Mr. Balint. Appellants maintained they justifiably relied on EQT's representations and suffered prejudice as a result.

On February 15, 2024, the trial court entered an order granting EQT's MSJ. In an accompanying memorandum opinion, the trial court stated:

> EQT presented documentary evidence consisting of EQT Drilling Partner Report [(Exhibit B)], William Lane 4H Well Record [(Exhibit C)], EQT daily drilling report for William Lane 2H Construction [(Exhibit D)], [the map (Exhibit E)], William Lane 2

Declaration [(Exhibit F)], Royalty Spreadsheet [(Exhibit G)], [and] Declaration regarding drilling reports [(Exhibit G-1)]…. These documents support that on July 21, 2018, two days before the end of the extended primary lease term, the well bore for [the] William Lane 4H well was physically drilled into the property. [Appellants] argue the map … [lacked supporting] record evidence showing how it was created with EQT's records[, and t]hat the map … requires oral testimony explaining what it shows.

[Appellants] also argue that in late July 2018, [Mr.] Balint spoke by telephone with a representative of EQT who informed him that EQT had not commenced operations with respect to drilling a well through the property[,] and that the term of the lease was not extended by operat[ion]s. [Mr.] Balint asked for written confirmation that a well was not drilled and that the lease was not extended by operations. After receiving no response, [Mr.] Balint again requested written confirmation. Finally, on August 7, 2018, EQT emailed [Mr.] Balint[,] stating[:] "The expiration date of the lease has passed without EQT extending or holding this agreement. We decided not to extend or renew the lease." [EQT Email, 8/7/18.] EQT does not deny [it made] the oral and written statement[s] … to [Mr.] Balint. But rather, [EQT] argues it was mistaken when it did so. [Appellants] do not argue that the lease was extinguished by [EQT's] oral and written statement[s. Rather, Appellants argue the statements] confirm EQT did not intend to drill a well[,] and that the oral statement was confirmed by the email that stated [EQT] did not drill a well.

Trial Court Opinion, 2/15/24, at 2.

The trial court conducted the following analysis:

The central issue between the parties is whether drilling involving the leased premises took place before the expiration date of the lease. As noted above, [EQT] has presented [the] map showing drilling took place prior to the expiration date of the lease. If the maps and accompanying data are accurate, [EQT] should prevail. However, [Appellants] argue the [**Nanty-Glo**] decision … impacts this case.

"The **Nanty-Glo** rule prohibits summary judgment where the moving party relies exclusively on oral testimony, either through testimonial affidavits or deposition

testimony, to establish the absence of a genuine issue of material fact, except where the moving party supports the motion by using admissions of the opposing party or the opposing party's own witness." ***Lineberger v. Wyeth***, 894 A.2d 141 (Pa. Super. 2006).

However, as noted, [EQT] relies on a substantial number of documents to establish drilling took place before the expiration of the lease. It would appear in this case [EQT] relies on documentary evidence. ***Nanty-Glo*** is not implicated when an affidavit is supported by documentary evidence. ***Telwell, Inc. v. Grandbridge Real Estate Capital***, 143 A.3d 421 (Pa. Super. 2016).

[EQT] concedes its agents communicated to [Owners] the lease was expired[;] however, [EQT's] documents establish [that EQT] drilled through the leased premises before the lease termination, thereby renewing the lease.

[Appellants'] argument is that the documents supplied in the case by [EQT] are hearsay. However, based on the record as stated above, it does not appear that there are any genuine issues of material fact at issue. By the plain terms of the lease, [EQT's] drilling activities would continue the lease in effect. The [trial c]ourt therefore grants [EQT's] motion for summary judgment.

***Id.*** at 3-4.

Owners and LOLA timely filed separate notices of appeal. This Court granted Appellants' application to consolidate the appeals. Appellants have complied with Pa.R.A.P. 1925. In a statement in lieu of Rule 1925(a) opinion, the trial court stated its intention to rely on its February 15, 2024, opinion.

Owners identify four questions for our review:

1. Did the trial court improperly give deference to [the] map EQT created for purposes of litigation as the basis of its granting of EQT's Motion for Summary Judgment[,] when the map lacked proper foundation and required oral testimony to explain the map's contents and creation?

- 11 -

2. Did EQT's statements to [Mr.] Balint that EQT did not drill a well through the … property before the … lease expired, as well as statements that EQT had no interest in extending or renewing the lease[,] create a disputed issue of material fact concerning whether EQT drilled into the … property before the … lease expired?

3. Did EQT's statements to Mr. Balint, and subsequent repudiation of those statements by EQT as mistakes, create a disputed issue of material fact that only a jury can decide?

4. Does the doctrine of estoppel prevent EQT from claiming the … lease remains in effect?

Owners' Brief at 2-3 (issues reordered; capitalization modified).

LOLA identifies four substantially similar questions:

1. Did the trial court commit reversible error and abuse its discretion when it made an erroneous evidentiary and credibility determination that the map justified summary judgment despite the lack of a foundation, the lack of authentication, the map being hearsay, and when only oral testimony could explain what the map depicted?

2. Did the trial court commit reversible error and abuse its discretion when it disregarded record evidence that contradicted EQT's basis for summary judgment[,] namely (a) EQT's numerous verbal statements to Mr. Balint that EQT did not drill a well or conduct operations before the … lease expired on the … property, (b) EQT's written statement in the August 7, 2018 Email that EQT did not drill a well or conduct operations on the … property and that EQT would not extend or renew the … lease, and (c) the map showing the William Lane 4H well being drilled in September of 2018[,] create disputed issues of material fact that EQT did not drill a well or conduct operations on the … property before the … lease expired[?]

3. Did the trial court commit reversible error and abuse its discretion by making a credibility determination when it did not reject EQT's defense that its statements to Mr. Balint were a mistake, thus creating a disputed issue of material fact that only a jury can decide if there was a mistake or not?

4. Did the doctrine of estoppel prevent the trial court from entering summary judgment in EQT's favor and [prevent EQT from] claiming that the … lease remained in effect?

LOLA Brief at 4-5 (issues reordered; capitalization modified).

In reviewing a grant of summary judgment,

this Court's standard of review is *de novo* and our scope of review is plenary. ***Pyeritz v. Commonwealth of Pa., State Police Dep't***, 32 A.3d 687, 692 (Pa. 2011). A trial court should grant summary judgment only in cases where the record contains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. ***Summers v. Certainteed Corp.***, 997 A.2d 1152, 1159 (Pa. 2010). The moving party has the burden to demonstrate the absence of any issue of material fact, and the trial court must evaluate all the facts and make reasonable inferences in a light most favorable to the nonmoving party. ***Id.*** The trial court is further required to resolve any doubts as to the existence of a genuine issue of material fact against the moving party and "may grant summary judgment only where the right to such a judgment is clear and free from doubt." ***Toy v. Metro. Life Ins. Co.***, 928 A.2d 186, 195 (Pa. 2007). An appellate court may reverse a grant of summary judgment only if the trial court erred in its application of the law or abused its discretion.

***Toth v. Chambersburg Hosp.***, 325 A.3d 870, 873-74 (Pa. Super. 2024)

(citations modified).

An oil and gas lease

is in the nature of a contract and is controlled by principles of contract law. ***J.K. Willison v. Consol. Coal Co.***, 637 A.2d 979, 982 (Pa. 1994). It must be construed in accordance with the terms of the agreement as manifestly expressed, and "[t]he accepted and plain meaning of the language used, rather than the silent intentions of the contracting parties, determines the construction to be given the agreement." ***Id.*** (citations omitted). Further, a party seeking to terminate a lease bears the burden of proof. ***See Jefferson County Gas Co. v. United Natural Gas Co.***, 93 A. 340, 341 (Pa. 1915).

***T.W. Phillips Gas & Oil Co. v. Jedlicka***, 42 A.3d 261, 267 (Pa. 2012)

(citations modified).

> The interpretation of any contract is a question of law and this Court's scope of review is plenary. Moreover, we need not defer to the conclusions of the trial court and are free to draw our own inferences. In interpreting a contract, the ultimate goal is to ascertain and give effect to the intent of the parties as reasonably manifested by the language of their written agreement. When construing agreements involving clear and unambiguous terms, this Court need only examine the writing itself to give effect to the parties' understanding. This Court must construe the contract only as written and may not modify the plain meaning under the guise of interpretation. Further, it is fundamental that one part of a contract cannot be so interpreted as to annul another part, and that writings which comprise an agreement must be interpreted as a whole.

***Seneca Resources Corp. v. S & T Bank***, 122 A.3d 374, 380 (Pa. Super. 2015) (citations, quotation marks, and brackets omitted).

Initially, we address Appellants' compliance with Pa.R.A.P. 2119(a). Rule 2119(a) provides that

> [t]he argument [section of an appellant's brief] shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein….

Pa.R.A.P. 2119(a). "Appellate arguments which fail to adhere to these rules may be considered waived[.]" ***Lackner v. Glosser***, 892 A.2d 21, 29 (Pa. Super. 2006) (citation omitted). Here, Appellants' respective briefs each identify four questions, but divide their argument into only three parts. ***See*** Owners' Brief at 2-3, 10-27; LOLA's Brief at 4-5, 14-34. Of those three parts, only the part corresponding to the first issue clearly identifies which issue is

- 14 -

treated therein. *See* Owners' Brief at 21-27; LOLA's Brief at 26-34. For the other two parts, it is unclear which aspects of Appellants' argument correspond to the second, third, or fourth issues. *See* Owners' Brief at 10-21; LOLA's Brief at 14-26. In Appellants' analysis of EQT's allegedly mistaken statements, the second and third issues appear amalgamated. *See* Owners' Brief at 13-21; LOLA's Brief at 18-26. Appellants' arguments regarding EQT's unitization of Owner's property with other parcels seem to fall under their second issue, but their briefs do not make this clear. *See* Owners' Brief at 12-13; LOLA's Brief at 15-17. However, rather than deem Appellants' issues waived for their failure to comply with Rule 2119(a), we interpret Appellants' second issue as addressing the unitization question and their third issue as addressing EQT's allegedly mistaken statements.

We consider Appellants' first two issues together. In their first issue, Appellants argue the trial court improperly relied on the map. *See* Owners' Brief at 21-27; LOLA's Brief at 26-34; *see also* Owners' Reply Brief at 7-16; LOLA's Reply Brief at 11-22. Appellants argue the map was inadmissible hearsay and did not satisfy the business records exception to the hearsay rule.[4] Rather, Appellants assert, EQT "created [the map] solely for this

_____

[4] "[A] motion for summary judgment cannot be supported or defeated by statements that contain inadmissible hearsay evidence." ***Bezjak v. Diamond***, 135 A.3d 623, 631 (Pa. Super. 2016) (citation and quotation marks omitted). The business records exception provides that

*(Footnote Continued Next Page)*

- 15 -

litigation" and failed to explain "how [the map] was developed, what documents [comprise] the source material, and how from that source material the map can depict what it purports to depict." Owners' Brief at 23; LOLA Brief at 28. Appellants further assert the testimony needed to explain the

---

> [t]he following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
>
> ***
>
> **(6) Records of a Regularly Conducted Activity.** A record (which includes a memorandum, report, or data compilation in any form) of an act, event or condition if:
>
> (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a "business", which term includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Pa.R.E. 803(6). EQT attached to its MSJ a signed declaration stating that certain of its MSJ exhibits are "the type of document that EQT" creates "in the regular practice of its business." MSJ, Exhibit G-1 (Declaration of J.E.B. Bolen, 2/15/23), ¶¶ 4-5. However, the declaration described the map differently, stating it "was created using information in EQT's or its subsidiaries/affiliates' database that is input by an EQT representative for all wells that EQT or its subsidiaries/affiliates drill." *Id.*, ¶ 3.

map would run afoul of the ***Nanty-Glo*** rule. Appellants maintain the map was EQT's only evidence that the William Lane 4H wellbore penetrated the property on July 21, 2018. Without the map, Appellants argue, EQT failed to show it actually drilled through the property before July 23, 2018.

EQT counters "the trial court rightly exercised its discretion to consider the map…." EQT's Brief at 49. EQT further asserts the map was just one of many documents "indicating that EQT performed lease-extending activities during the primary term." ***Id.*** at 47. The trial court acknowledged Appellants' assertion that the map was hearsay, but conducted no hearsay analysis. Trial Court Opinion, 2/15/24, at 4. Nevertheless, the trial court relied on the map as one of a "substantial number of documents … establish[ing] that drilling took place before the expiration of the lease." ***Id.*** at 3.

In their second issue, Appellants argue the trial court improperly relied on evidence of EQT's activities on nearby parcels. ***See*** Owners' Brief at 12-13; LOLA's Brief at 15-17; ***see also*** Owners' Reply Brief at 22-25; LOLA's Reply Brief at 31-35. Appellants assert that because EQT did not file the William Lane 2 Declaration until December 27, 2018, the unitization was not in effect until after the lease's primary term expired on July 23, 2018. Appellants further assert the lease's terms do not authorize EQT's attempt to backdate the unitization. ***See*** William Lane 2 Declaration, 12/27/18 (purporting to declare the unitization "effective July 1, 2018"). Appellants maintain the recording of the declaration brings the unitization into existence,

and the declaration cannot be interpreted as simply memorializing a unitization that existed prior to the recording. *See* Lease, 7/23/08, ¶ 10 ("Lessee shall effect such consolidation by executing a declaration of consolidation … and recording the same in the recorder's office…."). Therefore, Appellants argue, EQT cannot benefit from the lease's unitization clause to demonstrate EQT engaged in activities before July 23, 2018, to extend the lease's primary term. *See id.* (providing that "[a]ny well drilled on [the] development unit whether or not located on the leased premises, shall nevertheless be deemed to be located upon the leased premises…."). Appellants argue that EQT's drilling on later-unitized parcels did not count as drilling on Owners' property for purposes of extending the lease.

EQT maintains the lease's terms do not require the recording of the declaration as "a condition precedent to all lease-extending activities on unitized parcels counting toward extending the [l]ease." EQT's Brief at 61 n.14. The trial court did not address the unitization issue, and did not explicitly rely on the unitization clause in granting EQT's MSJ. *See generally* Trial Court Opinion, 2/15/24.

Taken together, Appellants' first two issues assert that, without the benefit of the map or the unitization clause, EQT failed to show that it engaged in sufficient activities before July 23, 2018, to extend the lease. We decline to reach Appellants' first two issues, however, because we conclude neither

the map nor the unitization clause are necessary to support a determination that EQT engaged in activities sufficient to extend the lease.

We observe that nothing in the lease explicitly requires EQT to actually drill a wellbore into Owners' property before July 23, 2018, to extend the lease. Rather, paragraph 2 of the lease provides that it **"shall continue" beyond the primary term so long as "the premises shall be operated by the Lessee in the search for oil or gas...."** Lease, 7/23/08, ¶ 2 (emphasis added). The lease contains no definitions elucidating the meaning of "operated by the Lessee in the search for oil or gas," and Appellants do not address this language's precise meaning. Appellants simply assume that "operat[ion]" requires a wellbore to be physically drilled into the property. Our review of the lease discloses no support for this assumption.

We observe that paragraph 3 of the lease provides:

> This lease, however, shall become null and void and all rights of either party hereunder shall cease and terminate unless, within twelve months from the date hereof, a well shall be commenced on the premises, or unless the Lessee shall thereafter pay a delay rental of $15.00 Dollars each year, payments to be made annually until the commencement of a well. **A well shall be deemed commenced when preparations for drilling have been commenced.**

*Id.*, ¶ 3 (emphasis added). Paragraph 2 must be read in light of paragraph 3. *See Seneca Resources Corp.*, 122 A.3d at 380; *see also LJL Transp., Inc. v. Pilot Air Freight Corp.*, 962 A.2d 639, 647 (Pa. 2009) ("in determining the intent of the contracting parties, all provisions in the agreement will be construed together and each will be given effect.").

Read together, paragraphs 2 and 3 indicate that, at the very least, EQT is "operat[ing the premises] … in search of oil or gas" if it has "commenced [a well] on the premises." Lease, 7/23/08, ¶¶ 2-3.[5] Because paragraph 3 provides that a well is "deemed commenced when preparations for drilling have been commenced," *id.*, ¶ 3, EQT need only commence preparations for drilling a well on the property to extend the lease beyond the primary term.

Appellants do not dispute that EQT drilled the William Lane 4H well on Owners' property. Rather, they dispute whether the wellbore penetrated the property before July 23, 2018, and whether EQT's drilling on later-unitized parcels can be considered drilling on the property. In light of our interpretation of the lease, however, neither of these points is dispositive. Appellants fail to argue that EQT did not commence **preparations** for drilling the William Lane 4H well before July 23, 2018.

EQT adduced documentary evidence demonstrating that it commenced preparations for drilling the William Lane 4H well at least as early as March 2018, when it obtained the drilling permit and began setting conductors. *See* Exhibit O (March 13, 2018, William Lane 4H well permit); Exhibit B (March 11, 2018, EQT Drilling Partner Report for William Lane 4H, including "Operations Summary" detailing the setting of conductors); *see also* Exhibit C (DEP Well

---

[5] Construing the lease otherwise would allow an absurd result wherein EQT has "commenced [a well] on the premises," but is nevertheless not "operat[ing the premises] … in search of oil or gas." Lease, 7/23/08, ¶¶ 2-3.

Record for William Lane 4H, indicating "Bottom Hole Drilling 7/16/2018-9/3/2018"). This documentary evidence makes clear that EQT engaged in activities sufficient to extend the lease before its primary term expired on July 23, 2018. In reaching this conclusion, we do not consider the map or give EQT the benefit of the lease's unitization clause. Appellants' first two issues merit no relief.

In their third issue, Appellants argue that EQT's July/August 2018 statements to Mr. Balint that it had not engaged in activities to extend the lease (the statements) created a genuine issue of material fact as to whether EQT engaged in activities to extend the lease. **See** Owners' Brief at 12-14, 19-21; LOLA's Brief at 15-19, 24-26; **see also** Owners' Reply Brief at 16-18; LOLA's Reply Brief, 23-26. Appellants maintain the statements conflict with EQT's documents, particularly the map. Appellants assert the trial court improperly weighed evidence against the nonmoving parties when it disregarded the statements and credited EQT's documents.

EQT argues it produced documentary evidence proving the statements were mistaken. EQT's Brief at 40-43. Because its documents prove EQT engaged in lease-extending activities before the primary term's expiration date, EQT argues, the statements do not create a genuine issue of material fact. **Id.** The trial court agreed, stating EQT "concedes its agents communicated to [Owners] the lease was expired[;] however, [EQT's] documents establish [that EQT] drilled through the [property] before the lease

termination, thereby extending the lease." Trial Court Opinion, 2/15/24, at 4.

Initially, we note Appellants' contention that the statements create a genuine issue of material fact rests heavily on Appellants' inaccurate assumption that EQT's wellbore had to physically penetrate the property in order to extend the lease. Essentially, Appellants argue EQT's documents are inconclusive as to whether the wellbore **penetrated** the property before or after July 23, 2018, and the statements tend to show the penetration must have occurred after. However, as set forth above, the date EQT's wellbore penetrated the property is not dispositive. Even assuming the statements created an evidentiary conflict as to that date, they nevertheless do not create a genuine issue of material fact, as the fact is immaterial. When considering whether the statements were mistaken, we keep in mind that extension of the lease required only that EQT commence preparations for drilling a well. **See** Lease, 7/23/08, ¶¶ 2-3.

Our review discloses that an unidentified female representative of EQT (the representative) spoke with Mr. Balint in late July 2018, before the primary term's July 23, 2018, expiration date. **See** Mr. Balint Deposition Transcript, 3/28/22, at 47. The representative told Mr. Balint she "was looking inside [EQT's] land agent software, and that there were certain fields that there wasn't any data in." **Id.** The representative stated, "if there wasn't any data in those fields, then your lease—there wasn't any activity to hold it." **Id.** Mr.

Balint asked the representative "for a writing" confirming her verbal statements. *Id.* On August 7, 2018, EQT's landowner relations department emailed Mr. Balint, stating: "The expiration date of the lease has passed without EQT extending or holding this agreement. We have decided not to extend or renew this lease." EQT Email, 8/7/18.

On January 7, 2019, EQT's landowner relations department sent another email to Mr. Balint, in which it "apologize[d] for the miscommunication earlier sent to [Mr. Balint] by another CSR/Land Analyst." EQT Email, 1/7/19. EQT explained that "[b]ecause [its] Division Order department was recently still working on the Unit and getting it set up, the process hadn't reached the leasing department to update the actual lease. So that is the information the leasing analyst was going by when it said [the lease] was not extended." *Id.*

Appellants argue the trial court improperly made a "credibility determination" against the statements. Owners' Brief at 10; LOLA's Brief at 5. However, the trial court did not have to make a credibility determination in order to determine the statements were mistaken. The representative did not claim to have personal knowledge regarding whether EQT had engaged in activities to extend the lease. Rather, the representative explained she based her statements on the absence of data in certain fields within EQT's land agent software. In its January 7, 2019, email, EQT asserted that data had not been up-to-date, and the statements to Mr. Balint had been based on stale information.

Though we "evaluate all the facts and make reasonable inferences in a light most favorable to the nonmoving party," *Toth*, 325 A.3d at 873, we are nevertheless compelled to conclude the statements were indeed mistaken. EQT produced copious documentation showing substantial preparations to drill two wells were underway at the time EQT made the statements. As set forth above, these activities satisfied the lease's requirements for an extension beyond the primary term. In light of this documentation, the statements can only be understood as having been based on stale information. Appellants adduced no evidence showing the statements were accurate, while EQT adduced compelling evidence showing they were inaccurate.

We agree with the trial court that the statements do not create a genuine issue of material fact as to whether EQT engaged in activities sufficient to extend the lease before July 23, 2018. Accordingly, Appellants' third issue merits no relief.

In their fourth issue, Appellants argue the doctrine of equitable estoppel bars EQT from disclaiming its mistaken statements, as Appellants contend they justifiably relied on the statements. Owners' Brief at 13-19; LOLA's Brief at 18-24. Appellants argue the statements induced Owners to enter into their lease with LOLA, and caused Mr. Balint "stress and reputational harm." Owners' Reply Brief at 21; LOLA's Reply Brief at 31.

EQT argues Appellants failed to show they justifiably relied on the statements, and did not identify "any injury resulting from their purported

reliance." EQT's Brief at 38; *see also id.* at 32-40. In granting EQT's MSJ, the trial court did not address Appellants' equitable estoppel argument. *See generally*, Trial Court Opinion, 2/15/24.

Our Supreme Court has stated:

Equitable estoppel is a doctrine that prevents one from doing an act differently than the manner in which another was induced by word or deed to expect. A doctrine sounding in equity, equitable estoppel recognizes that an informal promise implied by one's words, deeds or representations which leads another to rely justifiably thereon to his own injury or detriment may be enforced in equity.

*Kreutzer v. Monterey County Herald Co.*, 747 A.2d 358, 361 (Pa. 2000) (citation omitted).

**Whether equitable estoppel exists in a given case is a question of law for the court to decide.** When reviewing questions of law, the trial court's conclusions of law are not binding on this [C]ourt, whose duty is to determine whether there was a proper application of the law to the facts by the trial court.

*Stonehedge Square Ltd. P'ship v. Movie Merchants, Inc.*, 685 A.2d 1019, 1023-24 (Pa. Super. 1996) (citations omitted; emphasis added); *see also Nesbitt v. Erie Coach Co.*, 204 A.2d 473, 476 (Pa. 1964) ("Whether an estoppel results from established facts is a question for the determination of the court…. It is for the jury to say whether alleged remarks were made, but it is for the court to decide whether they are susceptible of the inferences attributed to them." (citations and quotation marks omitted)).

Equitable estoppel may be applied

where the party asserting estoppel established by clear, precise and unequivocal evidence (1) that the party against whom the

- 25 -

doctrine is sought to be asserted intentionally or negligently misrepresented a material fact, knowing or with reason to know that the other party would justifiably rely on the misrepresentation, (2) that the other party acted to his or her detriment by justifiably relying on the misrepresentation, and (3) that there was no duty of inquiry on the party seeking to assert estoppel. The doctrine is one of "fundamental fairness" and its application will depend on the facts in each case.

***Stonehedge***, 685 A.2d at 1024 (citations omitted).

Our review discloses Appellants failed to establish the first element of equitable estoppel. Importantly, the record reflects that Owners executed their lease with LOLA on August 2, 2018—five days **before** EQT's August 7, 2018, email to Mr. Balint. Therefore, Appellants could not have relied on the email, and their equitable estoppel claims must rest solely on the verbal statements EQT made to Mr. Balint in July, before the primary term's expiration date.

Owners' claim fails because (1) Owners cannot justifiably rely on the statements EQT made before the primary term's expiration date as unequivocally establishing that the expiration date had passed without EQT extending the lease;[6] and (2) Mr. Balint's request for written confirmation of

_____

[6] EQT has asserted, and Appellants dispute, that EQT drilled the William Lane 4H wellbore through the property on July 21, 2023. As set forth above, our interpretation of the lease renders this factual dispute immaterial. However, the parties' focus on this dispute highlights the fact that EQT could extend the lease through July 23, 2018. The verbal statements EQT made before that date cannot be justifiably relied upon, as EQT still had additional time to engage in lease-extending activities. We reiterate that the representative
*(Footnote Continued Next Page)*

the verbal statements gave EQT reason to believe that Mr. Balint did not intend to rely on the verbal statements alone. LOLA's equitable estoppel claim fails because EQT made no representations to LOLA, and EQT had no reason to know LOLA would rely on its statements to Mr. Balint.[7] As Appellants failed to establish the first element of equitable estoppel "by clear, precise and unequivocal evidence," **Stonehedge**, 685 A.2d at 1024, we do not reach the other elements.

Because we determine Appellants' equitable estoppel claim lacks merit, the trial court's failure to address it does not constitute reversible error. Appellants' fourth issue merits no relief.

For the reasons set forth above, none of Appellants' claims merit relief. Our review confirms EQT demonstrated that there were no issues of material fact, and it was entitled to judgment as a matter of law. **See Toth**, 325 A.3d at 873. We therefore affirm the trial court's order granting summary judgment in EQT's favor.

Order affirmed.

Judge King joins the memorandum.

P.J.E. Ford Elliott files a dissenting memorandum.

---

spoke only to an absence of data within the land agent software, and did not claim direct knowledge of EQT's activities.

[7] LOLA's brief is unclear whether it asserts an equitable estoppel claim in its own right or merely one derivative of Owners' claim. **See** LOLA's Brief at 18-24.

- 27 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE: 06/03/2025